**JOHN DONNELLY & SONS et al., Plaintiffs,**

v.

**Roger L. MALLAR, Commissioner of Transportation, State of Maine, Defendant.**

Civ. No. 77–284–SD.

United States District Court, D. Maine, S. D.

July 11, 1978.

Richard P. Holme, Denver, Colo., Ralph I. Lancaster, Jr., Donald W. Perkins, David T. Flanagan, Portland, Me., for plaintiffs.

H. Cabanne Howard, Allan A. Toubman, Asst. Attys. Gen., Thomas G. Reeves, Maine Dept. of Transportation, Augusta, Me., for defendant.

## OPINION AND ORDER

GIGNOUX, District Judge.

In this action plaintiffs John Donnelly & Sons, National Advertising Company, and William S. Schaeffer challenge the constitutional validity of the recently enacted Maine Traveler Information Services Act, 23 M.R.S.A. §§ 1901–1925 (the "Maine Act" or the "Act") and seek declaratory and injunctive relief against defendant Roger L. Mallar who, as Commissioner of Transportation for the State of Maine, is charged with enforcement of the Act.

The Act provides, *inter alia,* for the statewide elimination of off-premises, outdoor "billboard" advertising.[1] Plaintiffs, two national billboard companies which operate in Maine, and one of their employees, have challenged the Act on the grounds that it violates the First Amendment to the United States Constitution (First Claim of the complaint), that it constitutes an invalid exercise of the police power in contravention of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (Second Claim of the complaint), that it deprives plaintiffs of their property without

just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution (Third Claim of the complaint), and that the State is barred by the doctrine of equitable estoppel from requiring the removal of plaintiffs' billboards (Fourth Claim of the complaint). Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1343(3), 2201, and 2202, and under the doctrine of pendent jurisdiction.

Currently before the Court are the parties' cross-motions for summary judgment on the First, Second and Fourth Claims of the complaint.[2] For the reasons set forth below, the Court holds that the Act does not violate plaintiffs' First Amendment rights (First Claim), that the Act does not constitute an invalid exercise by the State of its police power (Second Claim), and that the State is not barred by the doctrine of equitable estoppel from requiring the removal of plaintiffs' billboards (Fourth Claim).

### I

The factual and statutory background is uncomplicated and undisputed. At present there exist approximately 2520 off-premises billboards in the State of Maine, about half of which are standardized as to size and design and about half of which are not standardized. Though the vast majority of the billboards owned and operated by plaintiffs and other outdoor advertisers doing business in the State display signs purely commercial in nature, a number of billboards carry messages dealing with political, civic, religious and charitable subjects.

The purposes of the Act, as expressed in the legislative findings and statement of policy and purposes, 23 M.R.S.A. §§ 1901 and 1902, are threefold. First, the Act seeks to preserve and promote the general scenic character of the State of Maine. § 1902(4). The Maine Legislature expressly

---

1. The Act was scheduled to become effective on January 1, 1978. Plaintiffs commenced the instant litigation shortly before the effective date. In order to preserve the status quo, plaintiffs have agreed not to erect any new billboards and defendant has agreed not to commence the removal of any billboards pending the outcome of this suit.

2. By agreement of the parties, the question of whether the Act, on its face or as applied to plaintiffs, deprives them of their property without just compensation in violation of the Fifth and Fourteenth Amendments (Third Claim of the complaint) is not presently before the Court because of the need for further discovery.

found that scattered outdoor advertising throughout the State is detrimental to the preservation of the State's scenic resources. § 1901(4). Second, the Act is intended to preserve the State's scenic beauties not only for their aesthetic value but because the visual attractiveness of the State substantially promotes tourism, one of the State's major industries, as well as its general economic and cultural development. § 1901(1), (3) and (4). Finally, the Act is intended to promote highway safety by eliminating distractions to motorists. § 1901(5).

To achieve these objectives, the Act prohibits the erection or maintenance of signs visible from any public way, 23 M.R.S.A. § 1908, with three general exceptions. First, the Act permits on-premises advertising not containing moving parts or flashing lights, subject to certain restrictions as to size, height, placement and number of signs. 23 M.R.S.A. § 1914. Second, in order to provide a means of disseminating information to the traveling public with respect to business facilities and points of historical, recreational, or cultural interest, tne Act empowers the Commissioner to establish a system of "official business directional signs." 23 M.R.S.A. § 1906. Though these signs may be located off-premises, they are regulated as to type, size, location, color, lighting, and number. 23 M.R.S.A. §§ 1909–1912. In addition, the Commissioner is also to provide traveler information directories, guidebooks and maps and to establish tourist information centers at principal entrance points into the State. 23 M.R.S.A. §§ 1907, 1905. Finally, the Act exempts from its ban certain classes of off-premises signs including signs erected by churches and civic, historical and cultural organizations, signs promoting fairs and expositions, and signs which serve public functions. 23 M.R.S.A. § 1913. Included in the latter category are signs which pertain to activities such as charity drives and political campaigns. 23 M.R.S.A. § 1913(9).[3]

The Act provides two means for the removal of nonexempt off-premises bill-boards. The owners of signs located along the interstate or primary highway systems are to be compensated with billboard removal funds made available to the State by the federal government pursuant to the Highway Beautification Act of 1965, as amended, 23 U.S.C. § 131 *et seq.* (1976). 23 M.R.S.A. § 1915. Those signs eligible for such compensation are to be removed within four years of the effective date of the Act. 23 M.R.S.A. § 1921. All other non-exempt billboards are to be amortized over six years from the effective date of the Act; that is, they are to be permitted to remain in place until January 1, 1984, by which time the owners are assumed to have recouped their investments through profits. 23 M.R.S.A § 1916.

## II

Plaintiffs claim that by prohibiting the erection or maintenance of off-premises billboards, the Act impermissibly infringes upon their First Amendment guarantee of freedom of speech made applicable to the States by the Fourteenth Amendment. *Bigelow v. Virginia,* 421 U.S. 809, 811, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). Plaintiffs anchor their First Amendment argument in the series of recent United States Supreme Court cases which have accorded commercial speech a measure of the protection previously reserved for so-called "pure" or noncommercial speech. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia, supra.* The State, however, does not defend the Act on the ground that it

---

**3.** That § 1913(9) includes political advertising within its scope is made clear by the legislative history of the Act. *1977 Maine Legislative Record* at 2032 (1977).

affects merely commercial speech.[4] Rather, the State argues, and the Court agrees, that the Act is a permissible regulation of the time, place and manner of speech, having only a constitutionally permissive "incidental effect" on that activity.[5]

 The power of a state or local government to regulate the time, place, or manner of speech is of long-standing duration, *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and of continuing validity, *Linmark Associates, Inc. v. Willingboro, supra* 431 U.S. at 93–94, 97 S.Ct. 1614; *Virginia Pharmacy Board v. Virginia Consumer Council, supra* 425 U.S. at 771, 96 S.Ct. 1817. To constitute a legitimate time, place, or manner restriction, a regulation must satisfy three criteria: (1) the restriction on speech must be "justified without reference to the content of the regulated speech," (2) the restriction must "serve a significant governmental interest," and (3) in so doing, the restriction must "leave open ample alternative channels for communication of the information." *Virginia Pharmacy Board v. Virginia Consumer Council, supra; see Linmark Associates, Inc. v. Willingboro, supra; see also United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The Maine Act meets this three-pronged test.

A. The Act neither has the purpose nor the effect of regulating the content of speech. None of the express purposes of the Act—the enhancement of the State's scenic resources, the development of tourism and other economic growth, and the promotion of highway safety—pertain to the subject matter of a message displayed on an off-premises billboard. Nor do the various regulatory provisions of the Act purport to prohibit a particular message content. The purpose and effect of the Maine Act is to eliminate off-premises advertising, not to prohibit the transmission of any particular message. When ordinances or statutes attempt to regulate the content of speech, courts are swift to hold such restrictions unconstitutional. *E. g., Linmark Associates, Inc. v. Willingboro, supra* (municipal ordinance banning "For Sale" or "Sold" signs on homesites); *Baldwin v. Redwood City,* 540 F.2d 1360 (9th Cir. 1976), *cert. denied,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) (city ordinances restricting, *inter alia,* the display of "political campaign signs"); *Peltz v. City of South Euclid,* 11 Ohio St.2d 128, 228 N.E.2d 320 (1967) (city ordinance prohibiting all "political signs"). On the other hand, although the Supreme Court has never ruled on the constitutionality of comprehensive anti-billboard legislation,[6] every state court

---

**4.** Indeed, the State would have difficulty labeling the Act as a regulation of only commercial speech since some 24% of the messages carried on John Donnelly & Sons billboards and some 5% of the National Advertising Company signs are noncommercial in nature.

**5.** As defendant points out, while the Supreme Court has held that commercial speech falls within the ambit of the First Amendment, the Court has been careful neither to hold that commercial speech "is wholly undifferentiable from other forms" of speech nor to discard the "common-sense" differences between speech which proposes a commercial transaction and other varieties of speech. *Virginia Pharmacy Board v. Virginia Consumer Council, supra* at 771 n. 24, 96 S.Ct. at 1830. The Court has made clear that, although entitled to a certain degree of constitutional protection, commercial speech does not enjoy the same preferred position as does noncommercial speech, a distinction recently elucidated in *Ohralik v. Ohio State Bar Association,* —— U.S. ——, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978):

To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

*Id.* at ——, 98 S.Ct. at 1918.

**6.** In *Linmark Associates, Inc. v. Willingboro, supra,* the Court expressly refrained from deciding "whether a ban on signs or a limitation on the number of signs could survive constitutional scrutiny if it were unrelated to the suppression of free expression." *Id.* 431 U.S. at 94 n. 7, 97 S.Ct. at 1619.

which has considered whether such a law violates the First Amendment has sustained it. *Suffolk Outdoor Advertising Co. v. Hulse,* 43 N.Y.2d 483, 402 N.Y.S.2d 368, 370, 373 N.E.2d 263 (1977); *Donnelly Advertising Corp. v. Baltimore,* 279 Md. 660, 370 A.2d 1127, 1131–32 (1977); *John Donnelly & Sons v. Outdoor Advertising Board,* 339 N.E.2d 709, 721–22 (Mass.1975); *Markham Advertising Co. v. State,* 73 Wash.2d 405, 439 P.2d 248, 262–63 (1968), *appeal dismissed for want of a substantial federal question,* 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 512 (1969); *Ghaster Properties, Inc. v. Preston,* 176 Ohio St. 425, 200 N.E.2d 328, 338 (1964); *United Advertising Corp. v. Raitan,* 11 N.J. 144, 93 A.2d 362, 366 (1952) (Brennan, J.). Because the Act is not directed against the content of any messages, it meets the first component of the "time, place, or manner" test.

B. The speech restrictive aspects of the Act serve significant governmental interests.[7] In challenging the legitimacy of the governmental interests which the Act seeks to advance—the preservation of aesthetic values, the development of tourism and other economic growth, and the promotion of highway safety—, plaintiffs particularly attack the aesthetic considerations on which it is grounded. Plaintiffs claim that aesthetics alone is an insufficient basis for the enactment of such legislation. To be sure, at one time the mere preservation of aesthetic values was not deemed to be a governmental interest sufficient to sustain laws regulating billboards and similar outdoor signs. *Wolverine Sign Works v. Bloomfield Hills,* 279 Mich. 205, 271 N.W. 823, 825 (1937); *Varney & Green v. Williams,* 155 Cal. 318, 100 P. 867, 868 (Cal. 1909). Indeed, the minority view still adheres to the position that aesthetics alone does not justify comprehensive anti-bill-

board legislation. *Baltimore v. Mano Swartz, Inc.,* 268 Md. 79, 299 A.2d 828, 832 (1973); *Stoner McCray System v. Des Moines,* 247 Iowa 1313, 78 N.W.2d 843, 847–48 (1956); *see also Montgomery County v. Citizens Building & Loan Association, Inc.,* 20 Md.App. 484, 316 A.2d 322, 325 (1974). The emerging majority position, however, and the one to which this Court subscribes, is that the preservation and promotion of aesthetic standards do serve as an adequate basis for comprehensive anti-billboard legislation such as the Maine Act. *Suffolk Outdoor Advertising Co. v. Hulse, supra,* 402 N.Y.S.2d at 371, 373 N.E.2d at 265; *John Donnelly & Sons v. Outdoor Advertising Board, supra* at 717–19; *Markham Advertising Co. v. State, supra* 439 P.2d at 258–60; *Ghaster Properties, Inc. v. Preston, supra* 200 N.E.2d at 337. As Mr. Justice Douglas presciently observed several years ago:

> The concept of public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the Legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.

*Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954); *see also Belle Terre v. Boraas,* 416 U.S. 1, 5–6, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). The nation's recently-awakened and growing concern for the quality of its environment and the various and widespread steps taken by individuals, citizen groups, and governmental bodies to protect and enhance natural resources demonstrate beyond reasonable question that the Maine Act serves substantial governmental interests through the preservation of aesthetic values.[8]

---

**7.** As the parties agree, the question of whether the Act serves a "significant governmental interest" is identical to that of whether the Act furthers a "legitimate legislative objective." The latter standard, of course, is a vital element in the determination of whether a statute constitutes a valid exercise of the police power. *Goldblatt v. Hempstead,* 369 U.S. 590, 594–95,

82 S.Ct. 987, 8 L.Ed.2d 130 (1962), discussed *infra* at Part III.

**8.** It also should be noted that the Supreme Court has consistently sustained reasonable regulation of speech which, regardless of the content of the messages being transmitted, involves unavoidable intrusions into the privacy

Furthermore, when aesthetic considerations are linked to economic consequences, such as the preservation of property values or the promotion of tourism and the fostering of general economic growth, there can be no doubt but that substantial governmental interests are served. *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Wright v. Michaud,* 160 Me. 164, 173, 200 A.2d 543 (1964). Plaintiffs appear to overlook the fact that a primary goal of the Act is economic in nature, that aesthetics is directly coupled with development of the State's vital tourist industry. The promotion of tourism manifestly is a valid legislative objective. *E. B. Elliott Advertising Co. v. Metropolitan Dade County,* 425 F.2d 1141, 1151 (5th Cir.), *cert. denied,* 400 U.S. 805, 91 S.Ct. 12, 27 L.Ed.2d 35 (1970). Even those jurisdictions which are reluctant to endorse the preservation of aesthetic values alone as a proper basis for the exercise of the police power recognize that when legislation based on aesthetic considerations also promotes economic growth, a significant governmental interest is served. *Donnelly Advertising Corp. v. Baltimore, supra* 370 A.2d at 1133–34; *Metromedia, Inc. v. San Diego,* 67 Cal. App.3d 84, 136 Cal.Rptr. 453, 457 (1977). Both because aesthetics itself appropriately may be the object of governmental regula-

tion, and because the Maine Act not only promotes aesthetic values but also seeks to foster economic growth, the Act serves a significant governmental interest, and thus satisfies the second part of the "time, place, or manner" test.[9]

C. The Act leaves open ample alternative channels for communication of the information now carried by off-premises outdoor advertising. Plaintiffs argue that billboards are a "unique and distinct medium of mass communication," which will be destroyed by the Maine Act, thus leaving the users of the medium no alternative for the communication of their messages. They essentially make the point that billboards serve a useful function in conveying information to travelers on the highways as to the direction and distance to motels, restaurants, tourist attractions and other points of interest, and that for this purpose billboards have two advantages over other media: their low cost and their geographic selectivity. The Maine Act, however, recognizes this fact and makes special provision for alternative means for the communication of information to travelers such as is currently conveyed by off-premises billboards. Many, if not all, of the commercial messages displayed on off-premises signs can be con-

---

of the recipients of the messages. In *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), a seminal case, the Court sustained an ordinance prohibiting the use of sound trucks precisely because the individual receiving the messages was "practically helpless to escape this interference with his privacy." *Id.* at 86–87, 69 S.Ct. at 453. The fact that recipients of billboard messages are in a similar position to recipients of sound truck messages was first noted by Mr. Justice Brandeis in *Packer Corp. v. Utah,* 285 U.S. 105, 52 S.Ct. 273, 76 L.Ed. 643 (1932), in which he quoted the words of a lower court that,

Advertisements of this sort are constantly before the eyes of observers on the streets . . . to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. The young people as well as the adults have the messages of billboards thrust upon them by all the arts and devices that skill can produce. In the case of newspapers and magazines, there must be some seeking by the one

who is to see and read the advertisement. The radio can be turned off, but not so the billboard . . . . .

*Id.* at 110, 52 S.Ct. at 274, *quoted with approval* in *Lehman v. Shaker Heights,* 418 U.S. 298, 302, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). It is evident that billboards fall within this category of intrusive speech. *John Donnelly & Sons v. Outdoor Advertising Board, supra* at 721–22.

**9.** Clearly, as plaintiffs concede, the promotion of highway safety is a proper basis for the exercise of the police power. *Markham Advertising Co. v. State, supra* 439 P.2d at 258; *E. B. Elliott Advertising Co. v. Metropolitan Dade County, supra* at 1151–52. Plaintiffs argue, however, that the Maine Legislature could not reasonably have found that the elimination of off-premises billboards will promote traffic safety. Since the Court concludes that the aesthetic and aesthetic-economic objectives of the Act provide a sufficient basis for the exercise of the State's police power, the Court need not explore the relationship between billboards and highway safety.

veyed to the traveling public through on-premises advertising, official business directional signs, and tourist information centers and publications, all of which are sanctioned by the Act. 23 M.R.S.A. § 1914; §§ 1906, 1909–1912; §§ 1905, 1907. Moreover, noncommercial messages such as those conveyed by political, civic and charitable signs, are specifically exempted from the broad ban on off-premises advertising. 23 M.R.S.A. § 1913(9). Other forms of print media, which, like outdoor advertising, enjoy the advantage of being relatively low in cost, such as pamphleting and leafleting, lie beyond the scope of the Act altogether, and thus remain available for commercial and noncommercial advertising alike.[10] In short, the Maine Act clearly leaves open numerous alternative channels for communication of the information now carried by off-premises billboards. It thus meets the third prong of the "time, place or manner" test.

The Maine Act constitutes a valid regulation of the time, place and manner of speech; plaintiffs' attack on First Amendment grounds accordingly must fail.

### III

■ Plaintiffs' claim that the Maine Act constitutes an invalid exercise of the police power is equally without merit. It is firmly established that in determining whether a statute constitutes a valid exercise of the police power, the court must engage in a two-step analysis: first, the court must determine whether the statute is in furtherance of a legitimate legislative objective, and, second, the court must determine whether the means employed are reasonably related to the furtherance of that objective. In *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962),

the Supreme Court succinctly framed the appropriate inquiry:

> To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

*Id.* at 594–95, 82 S.Ct. at 990, *quoting with approval Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894). *See also Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) ("It is enough that there is an evil at hand for correction, and that it may be thought that the particular legislative measure was a rational way to correct it.").

Furthermore, in applying this test, the court is to exercise great restraint:

> Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases, the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation . . . . . . The role of the judiciary in determining whether [legislative] power is being exercised for a public purpose is an extremely narrow one.

*Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 100, 99 L.Ed. 27 (1954). *See also Sproles v. Binford,* 286 U.S. 374, 388, 52 S.Ct. 581, 585, 76 L.Ed. 1167 (1932) ("[D]ebatable questions as to reasonableness are not for the courts but for the legislature . . .").

■ Under the foregoing standards,[11] the Maine Act unquestionably constitutes a valid exercise of the police power.

---

**10.** Though plaintiffs stress the importance of outdoor signs as an advertising and communications medium, it is instructive to note that in 1977, only 1.2% of all advertising expenditures were for outdoor advertisements. *1977 Statistical Abstract of the United States* at 845 (1977). This percentage represents a decline from 1968 when 1.6% of advertising expenditures were directed toward outdoor media. *John Donnelly & Sons, Inc. v. Outdoor Adver-*

*tising Board, supra* at 721 n. 15. The overwhelming majority of advertisers thus already avail themselves of alternative modes of communication.

**11.** Other questions suggested by plaintiffs, such as whether the statute abolishes a "legitimate business" or deprives an owner of his property and whether the public gains outweigh the private losses, may be appropriately

A. The Act is in furtherance of legitimate legislative objectives. As demonstrated in Part II, B, *supra,* both the aesthetic and the economic purposes of the Act serve significant governmental interests and constitute a proper basis for the exercise by the State of its police power. *Berman v. Parker, supra* 348 U.S. at 33, 75 S.Ct. 98; *Suffolk Outdoor Advertising Co. v. Hulse, supra* 402 N.Y.S.2d at 370–71, 373 N.E.2d at 264–265; *Donnelly Advertising Corp. v. Baltimore, supra* 370 A.2d at 1133–34; *John Donnelly & Sons v. Outdoor Advertising Board, supra* at 716–19; *Markham Advertising Co. v. State, supra* 439 P.2d at 258–60; *Ghaster Properties, Inc. v. Preston, supra* 200 N.E.2d at 337; *Metromedia, Inc. v. San Diego, supra* 136 Cal.Rptr. at 457.

B. The means employed by the State are reasonably related to the furtherance of the Act's objectives. Plaintiffs' principal challenge to the means which the State has adopted to implement the Act's objectives is that the state-wide ban on off-premises billboards is geographically overbroad and patently unreasonable. The substantial majority of courts which have considered geographically comprehensive anti-billboard legislation, however, have sustained the legislation as reasonable and proper exercises of the police power. *Suffolk Outdoor Advertising Co. v. Hulse, supra; Donnelly Advertising Corp. v. Baltimore, supra; John Donnelly & Sons v. Outdoor Advertising Board, supra; Boothbay v. National Advertising Co.,* 347 A.2d 419 (Me.1975); *Markham Advertising Co. v. State, supra; Cromwell v. Ferrier,* 19 N.Y.2d 263, 279 N.Y.S.2d 22, 225 N.E.2d 749 (1967); *Ghaster Properties, Inc. v. Preston, supra;*

*United Advertising Corp. v. Raritan, supra; United Advertising Corp. v. Metuchen,* 42 N.J. 1, 198 A.2d 447 (1964); *Murphy, Inc. v. Westport,* 131 Conn. 292, 40 A.2d 177 (1944). Plaintiffs endeavor to distinguish these cases on the ground that the geographical areas in question were small, residential communities without significant commercial or industrial sections.[12] Plaintiffs instead place heavy emphasis on several state court opinions which have struck down billboard legislation in whole or in part because of the extensive geographical breadth of the legislation in question. *See Metromedia, Inc. v. San Diego, supra* 136 Cal.Rptr. at 460 (City of San Diego); *Combined Communications Corp. v. Denver,* 542 P.2d 79, 81–83 (Colo.1975) City and County of Denver); *Norate Corp. v. Zoning Board of Adjustment,* 417 Pa. 397, 207 A.2d 890, 895–96 (1965) (Upper Moreland Township, Pa.). In essence, plaintiffs concede that a state or local government may ban all billboards in suburban, residential or rural areas, but argue that they may not prohibit billboards in urban, commercial or industrial areas.

Plaintiffs' attempt to differentiate between areas which may be preserved and improved aesthetically and those which may not is wholly unpersuasive. The Court can find no rational basis for concluding, as plaintiffs would suggest, that residents of and visitors to urban, commercial or industrial districts are not entitled to the benefit of an aesthetically pleasing environment, while those living in or visiting suburban, residential or rural regions are. Indeed, the Maine Legislature might reasonably conclude that just as the scenic beauty of country and

---

raised, if at all, in the consideration of plaintiffs' claim that the Maine Act deprives them of their property without just compensation in violation of the Fifth and Fourteenth Amendments (Third Claim of the complaint), an issue which, by agreement of the parties, is not currently before the Court. The question of whether the Maine Act constitutes an invalid exercise of the police power in violation of the Due Process Clause of the Fourteenth Amendment is distinct from the question of whether

the Act, on its face or as applied to plaintiffs, deprives them of their property without just compensation in violation of the Fifth and Fourteenth Amendments.

12. Plaintiffs assert that no court has ever sustained a state-wide ban on off-premises billboards. It appears, however, that only one other state, Vermont, has enacted a similar law, and Vermont's statute has not yet been challenged.

coastal areas promotes tourism, improving the aesthetic quality of business districts helps attract new businesses and contributes to general economic development. *See John Donnelly & Sons v. Outdoor Advertising Board, supra* at 720. This Court agrees with the views expressed by the Supreme Judicial Court of Massachusetts in *John Donnelly & Sons v. Outdoor Advertising Board, supra,* that "[W]hether an area is urban, suburban, or rural should not be determinative of whether the residents are entitled to preserve and enhance their environment. . . . [T]o conclude that an area is too unattractive to justify aesthetic improvement would be both unreasonable and illogical."

The Maine Act's state-wide prohibition of off-premises billboards is an appropriate means of accomplishing the Act's objectives.

The Maine Act is in furtherance of legitimate legislative objectives and the means employed are reasonably related to the furtherance of those objectives; plaintiffs' challenge to the Act on the ground that it constitutes an invalid exercise of the police power accordingly must fail.[13]

## IV

■ Plaintiffs' final claim is that the State is barred by the doctrine of equitable estoppel from requiring the removal of plaintiffs' billboards. Plaintiffs assert that, because prior legislation authorized permits for off-premises billboards, and because plaintiffs in reliance upon the permit system expended substantial sums of money in the erection of billboards, the State is now foreclosed from enforcing the current Act. The short answer to this contention is that the common law of the State of Maine,

which, as the parties agree, the Court must apply to this question, is in accord with the general rule that when the legislature acts in its governmental or sovereign capacity, as opposed to a business or proprietary role, the doctrine of estoppel is inapplicable. *Dolloff v. Gardiner,* 148 Me. 176, 186–87, 91 A.2d 320 (1952); *Milo v. Milo Water Co.,* 131 Me. 372, 378–79, 163 A. 163 (1932). Enacted pursuant to the police power in order to promote the public welfare, the Maine Act falls squarely within this rule.

■ Moreover, even if the estoppel doctrine were applicable to this case, there is no factual basis upon which an estoppel could be successfully asserted to preclude the State from enforcing the Act. The State neither proposes to revoke extant permits, nor does it plan to breach any present or future public commitments upon which plaintiffs may have relied. *Cf. Stoner McCray Systems v. Des Moines, supra,* 78 N.W.2d at 848–49. The permits which plaintiffs and other outdoor advertisers were required to obtain under the Outdoor Advertising Act of 1969, which the new Act has superseded, were annual permits only and expired at the end of each calendar year. 1969 Me. Acts, c. 257, §§ 2713, 2714. The State, therefore, has made no representation that plaintiffs' billboards could remain in place forever. There simply exist no grounds for concluding that doctrines of equity should prevent the State from implementing the present Act.

\*　　\*　　\*　　\*　　\*　　\*

Defendant's motion for summary judgment on Counts I, II and IV of the complaint is granted, and plaintiffs' motion for partial summary judgment is denied.

IT IS SO ORDERED.

---

**13.** Throughout their brief, plaintiffs cite a number of cases invalidating anti-billboard statutes or ordinances on grounds not now raised in this case. These include cases finding ordinances to be *ultra vires* a municipality's charter, *e. g., Combined Communications Corp. v. Denver, supra* ; *Dolson Outdoor Advertising Co. v. Macomb,* 46 Ill.App.3d 116, 4 Ill.Dec. 692, 360 N.E.2d 805 (1977); cases invalidating anti-billboard legislation on Equal Protection grounds, *e. g., Metromedia, Inc. v. Des Plaines,* 26 Ill. App.3d 942, 326 N.E.2d 59 (1975); and cases striking down statutes as unconstitutional takings of property without compensation, *e. g., Stoner McCray System v. Des Moines, supra* 78 N.W.2d at 849–50. These cases are not relevant to the issues presently before this Court.