[L.A. No. 30782. Apr. 14, 1980.]

METROMEDIA, INC., Plaintiff and Respondent, v.
CITY OF SAN DIEGO, Defendant and Appellant.

PACIFIC OUTDOOR ADVERTISING COMPANY, INC.,
Plaintiff and Respondent, v.
CITY OF SAN DIEGO et al., Defendants and Appellants.

COUNSEL

John W. Witt, City Attorney, Ronald L. Johnson, Chief Deputy City Attorney, and C. Alan Sumption, Deputy City Attorney, for Defendants and Appellants.

Walter Wencke, Carter J. Stroud, City Attorney (Alameda), John W. Scanlon, City Attorney (Hayward), Dan Curtin, City Attorney (Walnut Creek), Roy E. June and R. R. Campagna, City Attorneys (Costa Mesa), Harry S. Fenton, Emerson Rhyner and Ronald W. Beals as Amici Curiae on behalf of Defendants and Appellants.

Gibson, Dunn & Crutcher, Theodore B. Olson, Wayne W. Smith, Hillyer & Irwin, Oscar F. Irwin, Snell & Wilmer, John J. Bouma, Guy G. Gelbron, Higgs, Fletcher & Mack, Joe N. Turner, Cahill, Gordon & Reindel and Floyd Abrams for Plaintiffs and Respondents.

Donovan, Leisure, Newton & Irvine, Mahlon F. Perkins, Jr., Weil, Guttman & Davis, Gilbert H. Weil, Phillip Tocker, Richman & Garrett, Lionel Richman, Fadem, Berger & Norton, Michael M. Berger, Brundage, Beeson & Pappy, Joseph J. Kaplon, Alex Kozinski, Ronald A. Zumbrun, Thomas E. Hookano and Elleene A. Kirkland as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

**TOBRINER, J.**—The City of San Diego enacted an ordinance which bans all off-site advertising billboards and requires the removal of existing billboards following expiration of an amortization period. Plaintiffs, owners of billboards affected by the ordinance, sued to enjoin its enforcement. Upon motion for summary judgment, the superior court

adjudged the ordinance unconstitutional, and issued the injunction as prayed.

We reject the superior court's conclusion that the ordinance exceeded the city's authority under the police power. We hold that the achievement of the purposes recited in the ordinance—eliminating traffic hazards and improving the appearance of the city—represent proper objectives for the exercise of the city's police power, and that the present ordinance bears a reasonable relationship to those objectives. We reject also the lower court's alternative holding that the ordinance violates the First Amendment; judicial decisions demonstrate that a ban on commercial off-site billboards, enacted under the city's authority to regulate the commercial use of real property, does not abridge freedom of speech or press.

We agree with plaintiffs, however, that the San Diego ordinance is partially preempted by state law. By requiring uncompensated removal of billboards within 660 feet of federal interstate and primary highways, the ordinance endangers the state's share of federal highway funds; the ordinance thereby comes into conflict with provisions of the Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.) which require compensation when necessary to protect the state's receipt of federal monies. The ordinance's prohibition on construction of new billboards, and its provisions for uncompensated removal of billboards beyond the 660-foot limit, are not preempted by state law.

Plaintiffs also urge that we sustain the summary judgment on a variety of other grounds; they contend that it denies the equal protection of the law; that its amortization provisions are facially unreasonable; and that the city failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.). For the reasons we set forth, we conclude that none of these grounds will sustain the judgment below.

We conclude that the judgment of the superior court should be reversed and the case remanded to that court for further proceedings. At that time the court may determine which if any of plaintiffs' billboards fall within the preemptive scope of the Outdoor Advertising Act and render judgment that the ordinance may not be validly applied to require uncompensated removal of such billboards.

## 1. *Summary of proceedings in the trial court.*

The present case concerns the constitutionality of San Diego Ordinance No. 10795 (New Series), enacted March 14, 1972. With limited exceptions specified in the footnote,[1] the ordinance as subsequently amended prohibits all off-site "outdoor advertising display signs."[2] Off-site signs are defined as those which do not identify a use, facility or service located on the premises or a product which is produced, sold or manufactured on the premises. All existing signs which do not conform to the requirements of the ordinance must be removed following expira-

---

[1]The original ordinance permitted the following off-site signs: Signs maintained in the discharge of a governmental function; bench advertising signs; commemorative plaques, religious symbols, holiday decorations and similar such signs; signs located within shopping malls not visible from any point on the boundary of the premises; signs designating premises for sale, rent or lease; public service signs depicting time, temperature or news; signs on vehicles conforming to city regulations; and temporary off-premises subdivision directional signs.

As originally enacted, the ordinance contained no exception for political signs. On October 19, 1977, the city council amended the ordinance to permit "Temporary political campaign signs, including their supporting structures, which are erected or maintained for no longer than 90 days and which are removed within 10 days after the election to which they pertain." (Ord. No. 12189 (New Series).) This amendment may have been prompted by the decision of the Ninth Circuit in *Baldwin v. Redwood City* (9th Cir. 1976) 540 F.2d 1360, in which that court held an ordinance regulating temporary signs to be an unconstitutional restriction upon political speech.

[2]The ordinance does not define the term "outdoor advertising display signs." The history of the ordinance and the arguments of the parties demonstrate that the purpose of the ordinance is the prohibition of commercial billboards. But although the amended ordinance excludes signs which fall within 12 specific exceptions, it fails to exclude many varieties of less obtrusive, noncommercial signs that present no significant aesthetic blight or traffic hazard. That failure, in light of the absence of a definition of the class of signs prohibited, suggests a danger that the ordinance might be construed to apply to signs of a character very different from commercial billboards—for example, to a picket sign announcing a labor dispute or a small sign placed in one's front yard proclaiming a political or religious message.

To avert that danger, and to avoid the risk of unconstitutional overbreadth which a broad construction of the ordinance might entail, we adopt a narrow construction limiting its proscription to those signs which clearly fall within the intendment of the enactment. (Cf. *Welton v. City of Los Angeles* (1976) 18 Cal.3d 497, 506-507 [134 Cal.Rptr. 668, 556 P.2d 1119]; *Braxton v. Municipal Court* (1973) 10 Cal.3d 138, 144-145 [109 Cal.Rptr. 897, 514 P.2d 697].) We find such a construction in the definition of the term "outdoor advertising display" in Revenue and Taxation Code section 18090.2: "a rigidly assembled sign, display, or device permanently affixed to the ground or permanently attached to a building or other inherently permanent structure constituting, or used for the display of, a commercial or other advertisement to the public." Although that specific definition was not before the San Diego City Council when it adopted Ordinance No. 10795, incorporation of that definition into the ordinance will fulfill the city's purpose of banning permanent structures used predominantly for commercial advertising, while avoiding the constitutional issues raised by a less certain or more expansive reading of the ordinance.

tion of an amortization period, ranging from 90 days to 4 years depending upon the location and depreciated value of the sign.

Plaintiffs, Metromedia, Inc., and Pacific Outdoor Advertising Company, Inc., are engaged in the outdoor advertising business and own a substantial number of off-site billboards subject to removal under Ordinance No. 10795. Plaintiffs filed separate actions against the city, attacking the validity of the ordinance. The actions were consolidated by stipulation.[3] After extensive interrogatories and requests for admission had been answered all parties moved for summary judgment.

To facilitate the determination of the motion for summary judgment the parties entered into a stipulation of facts. The following portions of that stipulation are particularly pertinent to the present appeal: "2. If enforced as written Ordinance No. 10795 will eliminate the outdoor advertising business in the City of San Diego. . . . 13. Each of the plaintiffs are the owners of a substantial number of outdoor advertising displays (approximately 500 to 800) in the City of San Diego. . . . 17. The displays have varying values depending upon their size, nature and location. 18. Each of the displays has a fair market value as a part of an income-producing system of between $2,500 and $25,000. 19. Each display has a remaining useful income-producing life in excess of 25 years. 20. All of the signs owned by plaintiffs in the City of San Diego are located in areas zoned for commercial and industrial purposes . . . . 28. Outdoor advertising increases the sales of products and produces numerous direct and indirect benefits to the public. Valuable commercial, political and social information is communicated to the public through the use of outdoor advertising. Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive. . . . 31. Many of plaintiffs' signs are within 660 feet and others are within 500 feet of interstate or federal primary highways. . . . 34. The amortization provisions of Ordinance No. 10795 have no reasonable relationship to the fair market value, useful life or income generated by the signs and were not designed to have such a relationship."[4]

---

[3]Defendants in the consolidated action are the city, the members of the city council, and the city planning director.

[4]Plaintiffs filed no declaration to support the motion for summary judgment, but relied solely upon the pleadings, the city's response to interrogatories, and the agreed stipulation of facts.

The trial court filed a memorandum opinion stating that the ordinance was invalid as an unreasonable exercise of police power and an abridgment of First Amendment guaranties of freedom of speech and press. The court then entered judgment enjoining enforcement of the ordinance. The city appeals from that judgment.

2. *The summary judgment cannot be sustained on the ground that the San Diego ordinance exceeds the city's authority under the police power.*

■ The San Diego ordinance, as we shall explain, represents a proper application of municipal authority over zoning and land use for the purpose of promoting the public safety and welfare.[5] The ordinance recites the purposes for which it was enacted,[6] including the elimination of traffic hazards brought about by distracting advertising displays and the improvement of the appearance of the city. Since these goals are proper objectives for the exercise of the city's police power, the city council, asserting its legislative judgment, could reasonably believe the instant ordinance would further those objectives.

Plaintiffs cannot question that a city may enact ordinances under the police power to eliminate traffic hazards. They maintain, however, that the city failed to prove in opposition to plaintiffs' motion for summary judgment that the ordinance reasonably relates to that objective. We could reject plaintiffs' argument on the simple ground that plaintiffs, as the parties asserting the unconstitutionality of the ordinance, bear the burden of proof (see *Associated Home Builders etc., Inc.* v. *City of Livermore, supra*, 18 Cal.3d 582, 609), and cannot rely upon the city's

---

[5]An ordinance restricting land use is valid under the police power if it has a real or substantial relation to the public health, safety, morals or general welfare. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 490 [234 P. 381, 38 A.L.R. 1479].)

[6]Part A of the ordinance declares: "It is the purpose of these regulations to eliminate excessive and confusing sign displays which do not relate to the premises on which they are located; to eliminate hazards to pedestrians and motorists brought about by distracting sign displays; to ensure that signing is used as identification and not as advertisement; and to preserve and improve the appearance of the City as a place in which to live and work.

"It is the intent of these regulations to protect an important aspect of the economic base of the City by preventing the destruction of the natural beauty and environment of the City, which is instrumental in attracting nonresidents who come to visit, trade, vacation or attend conventions; to safeguard and enhance property values; to protect public and private investment in buildings and open spaces; and to protect the public health, safety and general welfare."

failure of proof. To avoid unnecessary litigation upon remand of this cause, however, we have probed plaintiffs' broader argument: We hold as a matter of law that an ordinance which eliminates billboards designed to be viewed from streets and highways reasonably relates to traffic safety.

Billboards are intended to, and undoubtedly do, divert a driver's attention from the roadway. Whether this distracting effect contributes to traffic accidents invokes an issue of continuing controversy.[7] But as the New York Court of Appeals pointed out, "mere disagreement" as to "whether billboards or other advertising devices...constitute a traffic hazard...may not cast doubt on the statute's validity. Matters such as these are reserved for legislative judgment and the legislative determination, here expressly announced, will not be disturbed unless manifestly unreasonable." (*New York State Thruway Auth.* v. *Ashley Motor Ct.* (1961) 10 N.Y.2d 151 [218 N.Y.S.2d 640, 176 N.E.2d 566].) Many other decisions have upheld billboard ordinances on the ground that such ordinances reasonably relate to traffic safety;[8] we cannot find it manifestly unreasonable for the San Diego City Council to reach the same conclusion. As the Kentucky Supreme Court said in *Moore* v. *Ward* (Ky. 1964) 377 S.W.2d 881, 884: "Even assuming [plaintiffs] could produce substantial evidence that billboard signs do not adversely affect traffic safety,...the question involves so many intangible factors as to make debatable the issue of what the facts establish. Where this is so, it is not within the province of courts to hold a statute invalid by reaching a conclusion contrary to that of the legislature."

---

[7]"No matter what one's position on the sign and safety issue one can find the study to support it.... [D]espite the insights provided by statistical analyses, the case for the hazards of private signs rests largely upon common sense and the informed judgments of traffic engineers and other experts. The arguments are complex and sometimes highly technical, but on the whole, the courts are increasingly likely to conclude that regulation of private signs may be reasonably expected to enhance highway safety." (Dowds, *Private Signs and Public Interests*, in 1974 Institute on Planning, Zoning and Eminent Domain, p. 231.)

[8]See *City of Escondido* v. *Desert Outdoor Advertising, Inc.* (1973) 8 Cal.3d 785, 790 [106 Cal.Rptr. 172, 505 P.2d 1012]; *E.B. Elliott Adv. Co.* v. *Metropolitan Dade County* (5th Cir. 1970) 425 F.2d 1141, 1152; *General Outdoor Adv. Co.* v. *Department Pub. Works* (1935) 289 Mass. 149, 171 [193 N.E. 799]; *Newman Signs, Inc.* v. *Hjelle* (N.D. 1978) 268 N.W.2d 741, 757, app. dism. (1979) 440 U.S. 901 [59 L.Ed.2d 449, 99 S.Ct. 1205]; *Opinion of the Justices* (1961) 103 N.H. 268 [169 A.2d 762]; *United Advertising Corp.* v. *Metuchen* (1964) 42 N.J. 1, 4 [198 A.2d 447]; *State* v. *Lotze* (1979) 92 Wn.2d 52 [593 P.2d 811, 813-814], app. dism. 444 U.S. 921 [62 L.Ed.2d 177, 100 S.Ct. 257]; *Markham Advertising Co.* v. *State* (1978) 73 Wn.2d 405, 416 [439 P.2d 248], app. dism. (1969) 393 U.S. 316 [21 L.Ed.2d 512, 89 S.Ct. 553].

We further hold that even if, as plaintiffs maintain, the principal purpose of the ordinance is not to promote traffic safety but to improve the appearance of the community, such a purpose falls within the city's authority under the police power. In contending that aesthetic considerations cannot justify the exercise of the police power to prohibit billboards, plaintiffs rely on *Varney & Green v. Williams* (1909) 155 Cal. 318 [100 P. 867], which held unconstitutional an ordinance of the City of East San Jose prohibiting all advertising billboards. Asserting that the ordinance rested solely on the "promotion of aesthetic or artistic considerations," we stated that "it has never been held that these considerations alone will justify, as an exercise of the police power, a radical restriction of the right of an owner of property . . . ." (*Id.* at p. 320, quoting *City of Passaic v. Patterson Bill Posting Co.* (1905) 72 N.J.L. 285, 287 [62 A. 267].)

Constrained by this precedent, subsequent California Court of Appeal decisions have stated that aesthetic considerations cannot justify an ordinance prohibiting billboards. (See *Desert Outdoor Advertising, Inc. v. County of San Bernardino* (1967) 255 Cal.App.2d 765, 769 [63 Cal.Rptr. 543]; *County of Santa Barbara v. Purcell, Inc.* (1967) 251 Cal.App.2d 169, 173 [59 Cal.Rptr. 345]; *National Advertising Co. v. County of Monterey* (1962) 211 Cal.App.2d 375, 379 [27 Cal.Rptr. 136].) Only one decision, however, has actually invalidated a city ordinance on this ground. (*City of Santa Barbara v. Modern Neon Sign Co.* (1961) 189 Cal.App.2d 188, 191-194 [11 Cal.Rptr. 57].) In all other cases the courts have found some additional ground for the ordinance, such as elimination of driving hazards or promotion of tourist traffic. Relying on such additional grounds, the cases conclude that the ordinance did not become unconstitutional merely because aesthetic considerations may have played some part in motivating its enactment.[9]

Thus we could distinguish the present case from *Varney & Green v. Williams, supra,* 155 Cal. 318, on the ground that the present ordinance was not enacted exclusively for aesthetic purposes. We believe, however, that the holding of *Varney & Green v. Williams,* that aesthetic purposes alone cannot justify assertion of the police power to ban

---

[9]See *Desert Outdoor Advertising Inc. v. County of San Bernardino, supra,* 255 Cal.App.2d 765, 769; *County of Santa Barbara v. Purcell, Inc., supra,* 251 Cal.App.2d 169, 173; *Burk v. Municipal Court* (1964) 229 Cal.App.2d 696, 701-702 [40 Cal.Rptr. 425]; *Metromedia, Inc. v. City of Pasadena* (1963) 216 Cal.App.2d 270, 273 [30 Cal.Rptr. 731]; *National Advertising Co. v. County of Monterey, supra,* 211 Cal.App.2d 375, 378-379; see also *City of Escondido v. Desert Outdoor Advertising, Inc., supra,* 8 Cal.3d 785, 790.

billboards, is unworkable, discordant with modern thought as to the scope of the police power, and therefore compels forthright repudiation.

Because this state relies on its scenery to attract tourists and commerce, aesthetic considerations assume economic value. Consequently any distinction between aesthetic and economic grounds as a justification for billboard regulation must fail. "Today, economic and aesthetic considerations together constitute the nearly inseparable warp and woof of the fabric upon which the modern city must design its future." (*Metromedia, Inc.* v. *City of Pasadena, supra,* 216 Cal.App.2d 270, 273; *Burk* v. *Municipal Court, supra,* 229 Cal.App.2d 696, 702.)

The holding of *Varney & Green* v. *Williams* also conflicts with present concepts of the police power. Most jurisdictions now concur with the broad declaration of Justice Douglas in *Berman* v. *Parker* (1954) 348 U.S. 26 [99 L.Ed. 27, 75 S.Ct. 98]: "The concept of the public welfare is broad and inclusive. [Citation.] The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the Legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (*Id.,* at p. 33 [99 L.Ed. at p. 38].) Although Justice Douglas tendered this description in a case upholding the exercise of the power of eminent domain for community redevelopment, it has since been recognized as a correct description of the authority of a state or city to enact legislation under the police power. (*Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 5-6 [39 L.Ed.2d 797, 801-802, 94 S.Ct. 1536]; *City of Phoenix* v. *Fehlner* (1961) 90 Ariz. 13, 17 [363 P.2d 607]; *People* v. *Stover* (1963) 12 N.Y.2d 462, 467-468 [240 N.Y.S.2d 734, 191 N.E.2d 272]; *Oregon City* v. *Hartke* (1965) 240 Ore. 35, 48 [400 P.2d 255]; *Markham Advertising Co.* v. *State, supra,* 73 Wn.2d 405, 424.) As the Hawaii Supreme Court succinctly stated: "We accept beauty as a proper community objective, attainable through use of the police power." (*State* v. *Diamond Motors, Inc.* (1967) 50 Hawaii 33, 36 [429 P.2d 825].)[10]

---

[10]Among other decisions holding that a state or city pursuant to the police power may ban billboards on the basis of aesthetic considerations alone are: *Meritt* v. *Peters* (Fla. 1953) 65 So.2d 861; *John Donnelly & Sons* v. *Mallar* (D.Me. 1978) 453 F.Supp. 1272; *Donnelly Advertising Corp.* v. *City of Baltimore* (1977) 279 Md. 660 [370 A.2d 1127, 1133]; *E.B. Elliott Adv. Co.* v. *Metropolitan Dade County, supra,* 425 F.2d 1141, 1151; *Stuckey's Stores, Inc.* v. *O'Cheskey* (1979) 93 N.M. 312 [600 P.2d 258]; *Matter of Cromwell* v. *Ferrier* (1967) 19 N.Y.2d 263 [279 N.Y.S.2d 22, 225 N.E.2d 749, 21 A.L.R.3d 1212]; *Opinion of the Justices, supra,* 103 N.H. 268; *Markham Ad-*

Present day city planning would be virtually impossible under a doctrine which denied a city authority to legislate for aesthetic purposes under the police power. Virtually every city in this state has enacted zoning ordinances for the purpose of improving the appearance of the urban environment and the quality of metropolitan life. Many municipalities engage in projects of one type or another designed to beautify their communities. Indeed, *Varney & Green* v. *Williams* itself asserted "That the promotion of aesthetic or artistic considerations is a proper object of governmental care will probably not be disputed." (155 Cal. 318, 320.) But as the New York Court of Appeals pointed out, "Once it be conceded that aesthetics is a valid subject of legislative concern the conclusion seems inescapable that reasonable legislation designed to promote that end is a valid and permissible exercise of the police power. . . . [W]hether such a statute or ordinance should be voided should depend upon whether the restriction was 'an arbitrary and irrational method of achieving an attractive. . .community—and *not* upon whether the objectives were primarily aesthetic.'" (*People* v. *Stover, supra*, 12 N.Y.2d 462.)

In a subsequent decision, the New York Court of Appeals confirmed that aesthetic considerations may justify the exercise of the police power to ban all off-site billboards in a community. (*Suffolk Outdoor Adv. Co., Inc.* v. *Hulse* (1977) 43 N.Y.2d 483 [402 N.Y.S.2d 368, 373 N.E.2d 263], app. dism., 439 U.S. 808 [58 L.Ed.2d 101, 99 S.Ct. 66].) "It cannot be seriously argued," the New York court said, "that a prohibition of this nature is not reasonably related to improving the aesthetics of the community." (*Id.*, at p. 490.)[11] The fact that the ordi-

vertising Co. v. State, supra, 73 Wn.2d 405, 424; *John Donnelly & Sons* v. *Outdoor Advertising Bd.* (1970) 369 Mass. 206 [339 N.E.2d 709].

Indeed, the four cases cited in *Varney & Green* v. *Williams* to support the proposition that aesthetic considerations will not uphold a prohibition on billboards are no longer law in their respective jurisdictions. *City of Passaic* v. *Patterson Bill Posting Co., supra*, 72 N.J.L. 285, was repudiated by the New Jersey Constitution in 1947. *Commonwealth* v. *Boston* (1905) 188 Mass. 348 [74 N.E. 601], was overruled in *General Outdoor Advertising Co.* v. *Dept. of Public Works* (1935) 289 Mass. 149, 159-161 [193 N.E. 799]; *Bryan* v. *City of Chester* (1905) 212 Pa. 259 [61 A. 894], was distinguished as antedating enactment of zoning enabling legislation by the court in *Silver* v. *Zoning Board* (1955) 381 Pa. 41 [112 A.2d 84]. *People* v. *Green* (1903) 85 App.Div. 400 [83 N.Y.S. 460] was rejected in *People* v. *Stover, supra*, 12 N.Y.2d 462, 466-467, and *Matter of Cromwell* v. *Ferrier, supra*, 19 N.Y.2d 263, 270.

[11]Numerous cases have commented on the unaesthetic impact of highway billboards. (See, e.g., *State* v. *Diamond Motors, supra*, 50 Hawaii 33, 36; *United Advertising Corp.* v. *Metuchen, supra*, 42 N.J. 1, 6; *Markham Advertising Co.* v. *State, supra*, 73 Wn.2d 405, 417.) Public opinion surveys sponsored by the Federal Highway Beautifi-

nance bans billboards in commercial and industrial areas, and that it permits on-site signs, does not demonstrate that the ordinance as a whole lacks a reasonable relationship to improving community appearance. (*E.B. Elliott Adv. Co.* v. *Metropolitan Dade County, supra,* 425 F.2d 1141, 1152.) "[T]he notion that an extensively commercial or industrial area will be made more attractive by the absence of billboards is open to debate. Since the issue is debatable, however, the modern judicial presumption in favor of legislation [requires the court] to uphold the ordinance as a rational means of enforcing the legislative purpose of preserving aesthetics." (Lucking, *The Regulation of Outdoor Advertising: Past, Present and Future* (1977) 6 Envt'l. Aff. 179, 188.)

If the San Diego ordinance reasonably relates to the public safety and welfare, it should logically follow that the ordinance represents a valid exercise of the police power. ■ Plaintiffs contend, however, that the police power is subject to an additional limiting doctrine: That regardless of the reasonableness of the act in relation to the public health, safety, morals and welfare the police power can never be employed to prohibit completely a business not found to be a public nuisance.

This argument also rests on our decision in *Varney & Green* v. *Williams, supra,* 155 Cal. 318. There the court, as an alternative ground for its decision, held the East San Jose ordinance unconstitutional on the grounds that it did "not attempt...regulation, but undertakes to absolutely forbid the erection or maintenance of any bill-board for advertising purposes." (P. 321.) No California decision since *Varney & Green* has invalidated a billboard ordinance as prohibitory, but a few decisions of other states have struck down billboard ordinances on this ground. (See *Combined Communications Corp.* v. *City & Cty., Denver* (1975) 189 Colo. 462 [542 P.2d 79, 82-83]; *Metromedia, Inc.* v. *City of Des Plains* (1975) 26 Ill.App.3d 942 [326 N.E.2d 59, 61-62]; *Stoner McCray System* v. *City of Des Moines* (1956) 247 Iowa 1313, 1319-1320 [78 N.W.2d 843, 58 A.L.R.2d 1304]; *Norate Corp., Inc.* v. *Zoning Board of Adjustment* (1955) 417 Pa. 397, 407 [207 A.2d 890].)

For the reasons we shall offer, however, we believe that this doctrine, too, conflicts with reality and with current views of the police power. The distinction between prohibition and regulation in this case is one of words and not substance. "[E]very regulation necessarily speaks as a

cation Commission indicate that the general public agrees that billboards are unsightly. (See Dowds, *Private Signs and Public Interests, op. cit. supra,* p. 233.)

prohibition." (*Goldblatt v. Hempstead* (1962) 369 U.S. 590, 592 [8 L.Ed.2d 130, 133, 82 S.Ct. 987].) In the present case, for example, plaintiffs describe the ordinance as a *prohibition of off-site advertising*, while the city describes it as a *regulation of advertising*, one which limits advertising to on-site signs. Surely the validity of the ordinance does not depend on the court's choice between such verbal formulas.

Rather than strive to develop a logical distinction between "regulation" and "prohibition," and to find themselves embroiled in language rather than fact, courts of other jurisdictions in recent decisions have held that a community can entirely prohibit off-site advertising. (*John Donnelly & Sons v. Mallar, supra*, 453 F.Supp. 1272; *Murphy, Inc. v. Westport* (1944) 131 Conn. 292 [40 A.2d 177, 156 A.L.R. 568]; *John Donnelly & Sons, Inc. v. Outdoor Advertising Bd., supra*, 339 N.E.2d 709; *Suffolk Outdoor Adv. Co., Inc. v. Hulse, supra*, 43 N.Y.2d 483; *Matter of Cromwell v. Ferrier, supra*, 19 N.Y.2d 263.) These decisions fall within the general principle that a community may exclude any or all commercial uses if such exclusion reasonably relates to the public health, safety, morals or general welfare. (*Town of Los Altos Hills v. Adobe Creek Properties, Inc.* (1973) 32 Cal.App.3d 488, 502-504 [108 Cal.Rptr. 271], and cases there cited; see *Associated Home Builders etc., Inc. v. City of Livermore, supra*, 18 Cal.3d 582, 606, fn. 23.) As the Oregon Supreme Court explained in *Oregon City v. Hartke, supra*, 240 Ore. 35, "[I]t is within the police power of the city wholly to exclude a particular use if there is a rational basis for the exclusion . . . . It is not irrational for those who must live in a community from day to day to plan their physical surroundings in such a way that unsightliness is minimized. The prevention of unsightliness by wholly precluding a particular use within the city may inhibit the economic growth of the city or frustrate the desire of someone who wishes to make the proscribed use, but the inhabitants of the city have the right to forego the economic gain and the person whose business plans are frustrated is not entitled to have his interest weighed more heavily than the predominant interest of others in the community." (Pp. 49-50.)

Plaintiffs stress that most of the cases upholding a community ban on billboards or other commercial uses have involved small, predominantly residential, towns or rural localities. Recently, however, the Massachusetts Supreme Judicial Court upheld an ordinance similar to the one at issue here involving a total prohibition of billboards in a densely populated town with a sizable business and industrial district. (*John Donnelly & Sons, Inc. v. Outdoor Advertising Bd., supra*, 339 N.E.2d

709.) The court there stated that "We believe that it is within the scope of the police power for the town to decide that its total living area should be improved so as to be more attractive to both its residents and its visitors. Whether an area is urban, suburban or rural should not be determinative whether the residents are entitled to preserve and enhance their environment. Urban residents are not immune to ugliness." (P. 720.)

Relying on the cited Massachusetts decision, the United States District Court for the District of Maine recently upheld a statewide ban on off-site commercial billboards, including urban regions within the state. Its decision observes that it "can find no rational basis for concluding...that residents of and visitors to urban, commercial or industrial districts are not entitled to the benefit of an aesthetically pleasing environment, while those living in or visiting suburban, residential or rural regions are." (*John Donnelly & Sons v. Mallar, supra,* 453 F.Supp. 1272, 1281.)

Nor do we perceive how we could rationally establish a rule that a city's police power diminishes as its population grows, and that once it reaches some unspecified size it no longer has the power to prohibit billboards. San Diego, for example, has already prohibited billboards within *97 percent of its limits*—a region which in area and population far surpasses most California cities. Plaintiffs claim that a ban covering 97 percent of the city is a "regulation," while the extension of that ban to the remaining 3 percent of the city is a "prohibition," but such sophistry is a mere play upon words.

Thus the validity of Ordinance No. 10795 under the police power does not turn on its regulatory or prohibitory character, nor upon the size of the city which enacted it, but solely on whether it reasonably relates to the public safety and welfare. ▮ As we have explained, the ordinance recites that it was enacted to eliminate traffic hazards, improve the appearance of the community, and thereby protect property values. The asserted goals are proper objectives under the police power, and plaintiffs have failed to prove that the ordinance lacks a reasonable relationship to the achievement of those goals. We conclude that the summary judgment cannot be sustained on the ground that the ordinance exceeds the city's authority under the police power.[12]

---

[12]*Varney & Green v. Williams, supra,* 155 Cal. 318, is hereby overruled. Language in the following cases contrary to the views expressed herein is disapproved; *City of Es-*

3. *The summary judgment cannot be sustained
on the ground that the San Diego ordinance on
its face abridges freedom of speech.*

■ Although the trial court held that the San Diego ordinance unconstitutionally invaded the First Amendment rights of billboard advertisers, controlling precedent invalidates that conclusion. On almost every occasion in which a law which prohibited off-site commercial billboards has been challenged as an abridgment of freedom of speech, the courts have rejected that challenge and sustained the law. (See *Howard v. State Department of Hwys. of Colorado* (10th Cir. 1973) 478 F.2d 581; *John Donnelly & Sons v. Mallar, supra,* 453 F.Supp. 1272; *John Donnelly & Sons, Inc. v. Outdoor Advertising Bd., supra,* 339 N.E.2d 709; *Donnelly Advertising Corp. v. City of Baltimore, supra,* 370 A.2d 1127, 1132; *Newman Signs, Inc. v. Hjelle, supra,* 268 N.W.2d 741, 760-762; *United Advertising Corp. v. Borough of Raritan,* (1952) 11 N.J. 144 [93 A.2d 362]; *Stuckey's Stores, Inc. v. O'Cheskey, supra,* 600 P.2d 258; *Suffolk Outdoor Advertising Co., Inc. v. Hulse, supra,* 43 N.Y.2d 483; *Lubbock Poster Co. v. City of Lubbock* (Tex.Civ. App. 1978) 569 S.W.2d 935, 945; *Ackerley Communications, Inc. v. City of Seattle* (1979) 92 Wn.2d 905 [602 P.2d 1177]; *State v. Lotze, supra,* 593 P.2d 811, 813-815; *Markham Advertising Co. v. State, supra,* 73 Wn.2d 405.)[13]

Plaintiffs note that some of the decisions in point relied heavily on *Valentine v. Chrestensen* (1942) 316 U.S. 52 [86 L.Ed. 1262, 62 S.Ct.

---

*condido v. Desert Outdoor Advertising, Inc., supra,* 8 Cal.3d 785; *Desert Outdoor Advertising, Inc. v. County of San Bernardino, supra,* 255 Cal.App.2d 765; *County of Santa Barbara v. Purcell, Inc., supra,* 251 Cal.App.2d 169; *National Advertising Co. v. County of Monterey, supra,* 211 Cal.App.2d 375; *City of Santa Barbara v. Modern Neon Sign Co., supra,* 189 Cal.App.2d 188.

[13]The only exception is an unreported decision of a Colorado district court in Combined Communications Corporation v. City and County of Denver, cited in the trial court's memorandum opinion. The Colorado Supreme Court subsequently affirmed the decision without discussion of the First Amendment issue. (*Combined Communications Corp. v. City & Cty., Denver* (1975) 189 Colo. 462 [542 P.2d 79].)

The Oklahoma Supreme Court in *State* ex rel. *Dept. of Transp. v. Pile* (1979) 603 P.2d 337 held a state law prohibiting the erection of billboards within 660 feet of federal highways in rural areas violated an Oklahoma constitutional free speech provision as applied to prohibit a noncommercial billboard. The opinion is cast in broad terms which imply that the federal Highway Beautification Act and all state laws enacted to conform to that act abridge freedom of speech. The specific holding of the court, however, is limited to a question of Oklahoma constitutional law, and is distinguishable on several counts from the present case.

920], in which the Supreme Court declared that "the Constitution imposes no...restraint on government as respects purely commercial advertising." (*Id.*, at p. 54 [86 L.Ed. at p. 1265].) Within the last five years, a series of that court's decisions have repudiated *Valentine* v. *Chrestensen* and held that commercial speech may command First Amendment protection. (*Bigelow* v. *Virginia* (1975) 421 U.S. 809 [44 L.Ed.2d 600, 95 S.Ct. 2222]; *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817]; *Linmark Associates, Inc.* v. *Willingboro* (1977) 431 U.S. 85 [52 L.Ed.2d 155, 97 S.Ct. 1614]; *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691].) Plaintiffs contend that as a result of these decisions, a law prohibiting commercial billboards can no longer be sustained.

When first presented to us, plaintiffs' First Amendment contention presented an arguable issue. While this case was pending before us, however, the New York Court of Appeal, in *Suffolk Outdoor Advertising Co.* v. *Hulse, supra*, 43 N.Y.2d 483, upheld a community-wide ban on off-site billboards. The advertising company appealed to the United States Supreme Court, which dismissed the appeal for want of a substantial federal question. (439 U.S. 808 [58 L.Ed.2d 101, 99 S.Ct. 66].) Subsequently the court also dismissed appeals in two cases which sustained state laws banning off-site billboards outside of commercial or industrial areas. (*Newman Signs, Inc.* v. *Hjelle, supra*, 268 N.W.2d 741; *State* v. *Lotze, supra*, 593 P.2d 811.)

Each of the cited cases in which the Supreme Court dismissed appeals expressly rejected the contention that a prohibition on off-site billboards conflicts with the reasoning of the commercial speech cases. Since the Supreme Court regards the dismissal of an appeal as a decision on the merits (*Hicks* v. *Miranda* (1975) 422 U.S. 332, 343-345 [45 L.Ed.2d 223, 235-237, 95 S.Ct. 2281]), we conclude that the high court has resolved that a prohibition of off-site billboards does not violate the First Amendment.

An issue remains as to whether the San Diego ordinance violates the free speech clause of the California Constitution. (Art. I, § 2.) We therefore set forth our reasons for concluding that the San Diego ordinance is a permissible regulation of the time, place, and manner of speech, and thus does not abridge freedom of speech under the California Constitution.

Eight decisions of other jurisdictions, filed after the United States Supreme Court first ruled that commercial speech is protected under the First Amendment, have each held that laws prohibiting commercial off-site billboards do not impair freedom of speech. (See cases cited p. 866, *ante.*) The opinion of Judge Gignoux in *John Donnelly & Sons* v. *Maller, supra*, presents a comprehensive exposition of the validity of such laws as regulations of the time, place, or manner of speech. That opinion points out that an ordinance which regulates commercial speech will pass constitutional inspection as a lawful regulation of the time, place, and manner of speech if it satisfies three criteria: "the restriction on speech must be 'justified without reference to the content of the regulated speech,' (2) the restriction must 'serve a significant governmental interest,' and (3) in so doing, the restriction must 'leave open ample alternative channels for communication of the information.'" (*John Donnelly & Sons* v. *Mallar, supra*, 453 F.Supp. 1272, 1277, citing *Linmark Associates, Inc.* v. *Willingboro, supra*, 431 U.S. 85 and *Va. Pharmacy Bd.* v. *Va. Consumer Council, supra*, 425 U.S. 748.) The San Diego ordinance complies with these requirements.

First, the instant ordinance does not seek to suppress the content of the advertiser's message. Each of the high court decisions on which plaintiffs rely struck down laws aimed at the suppression of a particular message based on the content of that message. *Bigelow* invalidated a law prohibiting advertising which explained how to obtain an abortion; *Virginia Pharmacy Board* invalidated a law banning advertisement of drug prices; *Linmark* invalidated an ordinance banning residential "for sale" and "sold" signs; *Bates* invalidated a state bar rule against attorney advertising. Ordinance No. 10795, by way of contrast, was not enacted to prevent an advertiser from communicating his message to the public, but only to bar him from using a particularly unsightly and intrusive mode of communication.

Second, as we have already explained, the ordinance serves significant governmental interests—promoting traffic safety and improving the appearance of the community—unrelated to the suppression of free expression. (Cf. *United States* v. *O'Brien* (1968) 391 U.S. 367, 377 [20 L.Ed.2d 672, 680, 88 S.Ct. 1673].)

Finally, the ordinance leaves open adequate alternative means of communication. In upholding a Maine statute which imposed a statewide ban on off-site commercial billboards, the federal district court observed that the act "leaves open ample alternative channels for

communication of the information now carried by off-premise outdoor advertising.... Many, if not all, of the commercial messages displayed on off-premise signs can be conveyed to the traveling public through on-premise advertising, official business directional signs, and tourist information centers and publications, all of which are sanctioned by the Act.... Other forms of print media, which, like outdoor advertising, enjoy the advantage of being relatively low in cost, such as pamphleting and leafleting, lie beyond the scope of the Act altogether ...." (*John Donnelly & Sons v. Mallar, supra,* 453 F.Supp. 1272, 1279-1280.)

The New York Court of Appeals, sustaining a community ordinance which prohibited all off-site billboards, reached the same conclusion: "Although prohibiting non-accessory billboards, the ordinance permits the maintenance of accessory or on-premise billboards, thus providing an operative means of advertising." (*Suffolk Outdoor Advertising Co. v. Hulse, supra,* 43 N.Y.2d 483, 490.) "Since the challenged ordinance ...regulates only the place and manner in which billboards may be maintained, we conclude that [it] does not infringe the right to free speech guaranteed by the First Amendment." (*Id.,* at p. 489.)

The foregoing decisions properly hold that a community ordinance prohibiting off-site commercial billboards leaves open adequate alternative means of communication. Advertisers of consumer products and services can communicate through newspapers, magazines, radio, and television. Local business can in addition employ on-site billboards. The relatively few noncommercial advertisers who would be restricted by the San Diego ordinance also possess a great variety of alternative means of communication, including some methods, such as leafleting, which are not more expensive than billboards.[14] The San Diego ordinance is not unique; over 100 cities and towns in California and the entire States of Hawaii, Maine, and Vermont have banned off-site billboards; advertisers in such areas make use of other means of communicating with the public.

---

[14]Plaintiffs call attention to stipulation No. 28, which states in part that "Many businesses, politicians, and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive." The possibility that the ordinance may impede an occasional advertiser from communicating his message to the public, however, is not sufficient to invalidate the ordinance *on its face.* In the present litigation, which pits only the owners of the billboards against the city, individual advertisers are not parties; such an advertiser retains the ability to assert that, owing to the absence of reasonable alternative means of communication, the ordinance cannot constitutionally *be applied* to prevent him from using a billboard to proclaim his message.

In arguing that the San Diego ordinance cannot be sustained as a regulation of time, place, and manner, plaintiffs cite to cases involving leaflets, sound trucks, newspapers, maps, and other forms of communication which courts have held can be subjected only to narrowly drawn regulations serving a compelling governmental interest.[15] We do not find those cases controlling here. Unlike leaflets, newspapers, and the like, a billboard is a large, immobile, and permanent structure which like other structures is subject to zoning regulation. The city's right to regulate the commercial use of property, and to ban uses which imperil traffic safety or denigrate the appearance of the community justifies restrictions which go beyond those imposed upon more transitory or less obtrusive media.

We find support for our conclusion that the city's interest in regulating the commercial use of property justifies the instant ordinance in the decision of the United States Supreme Court in *Young* v. *American Mini Theaters* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440]. Upholding a zoning ordinance which prohibited adult theaters within 500 feet of residential areas or 1,000 feet of other adult establishments, the court held that the city's interest in regulating commercial use of real property outweighed the incidental effect of the ordinance upon First Amendment values. (See 427 U.S. at p. 63 [49 L.Ed.2d at pp. 321-322]; *id.*, at p. 76, 84 [49 L.Ed.2d at pp. 329-330, 334] (Powell, J., conc.).) Rejecting the contention that the challenged ordinance abridged freedom of speech, *Young* reiterated the principle that commercial speech acquires only a lesser degree of constitutional protection.[16] Significantly the court, to illustrate that principle, cited several examples of valid regulation of commercial speech, among which was the proposition that "A state statute may permit highway billboards to advertise businesses located in the neighborhood but not

---

[15]See *Schneider* v. *State* (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146] (leaflets); *Welton* v. *City of Los Angeles* (1976) 18 Cal.3d 497 [134 Cal.Rptr. 668, 556 P.2d 1119] (roadside sale of maps); *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276 [29 Cal.Rptr. 1, 379 P.2d 481] (soundtrucks); *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294 [138 Cal.Rptr. 53, 562 P.2d 1302] (newsracks).

[16]In *Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447 [56 L.Ed.2d 444, 98 S.Ct. 1912] the Supreme Court summarized the limited constitutional protection given commercial speech: "We have not discarded the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.... [W]e instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of non-commercial expression." (436 U.S. at pp. 455-456 [56 L.Ed.2d at pp. 452-454].)

elsewhere." (427 U.S. at p. 68 [49 L.Ed.2d at p. 325], citing the court's dismissal of the appeal in *Markham Advertising Co.* v. *State, supra*, 73 Wn.2d 405, app. dis., 393 U.S. 316 [21 L.Ed.2d 512, 89 S.Ct. 553].)[17]

The New York Court of Appeals also supports our distinction between billboards and other media. In 1976 that court held unconstitutional an ordinance which prohibited all commercial handbills. (*People* v. *Remeny* (1976) 40 N.Y.2d 527 [387 N.Y.S.2d 415, 355 N.E.2d 375].) One year later, however, the court upheld an ordinance which prohibited all off-site billboards as a permissible regulation of the time, place, and manner of speech. (*Suffolk Outdoor Advertising Co., Inc.* v. *Hulse, supra*, 43 N.Y.2d 483.)

In summary, San Diego asserts a strong interest in removing commercial off-site billboards to enhance the appearance of the community and to improve traffic safety. To further those ends, the city enacted a zoning ordinance which does not seek to suppress the content of the advertising messages, but only to prohibit one means by which such messages are placed before the public. A multitude of published decisions support the proposition that such an ordinance does not abridge freedom of speech. Finding that the recent commercial speech cases of the United States Supreme Court do not undermine those decisions, and that billboards, as permanent intrusive uses of land, may reasonably be distinguished from other media, we conclude that the San Diego ordinance does not on its face abridge freedom of speech under either the United States or California Constitutions.

4. ■ *The San Diego ordinance is preempted by the Outdoor Advertising Act to the extent that the ordinance requires removal without compensation of billboards within 660 feet of federal interstate and primary highways.*

Plaintiffs contend that the summary judgment below should be sustained on the ground that Ordinance No. 10795 is preempted by provisions of the Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.). Plaintiffs rely on two provisions: Section 5226, which states

---

[17]The Maryland Court of Appeals, sustaining a ban on billboards in the Oldtown urban renewal district of Baltimore, relied squarely on the Supreme Court decision in *Young* v. *American Mini Theaters.* (*Donnelly Advertising Corp.* v. *City of Baltimore, supra*, 370 A.2d 1127, 1132.)

generally the legislative policy and findings underlying the Outdoor Advertising Act, and section 5412, which requires payment of compensation for removal of billboards when such compensation is necessary to protect the state's share of federal highways funds.

Section 5226 reads as follows: "The regulation of advertising displays adjacent to any interstate highway or primary highway . . . is hereby declared to be necessary to promote the public safety, health, welfare, convenience and enjoyment of public travel, to protect the public investment in such highways, to preserve the scenic beauty of lands bordering on such highways, and to insure that information in the specific interest of the traveling public is presented safely and effectively, recognizing that a reasonable freedom to advertise is necessary to attain such objectives. The Legislature finds:

"(a) Outdoor advertising is a legitimate commercial use of property adjacent to roads and highways.

"(b) Outdoor advertising is an integral part of the business and marketing function, and an established segment of the national economy, and should be allowed to exist in business areas, subject to reasonable controls in the public interest."

The significance of section 5226 is not clear. The section states broad policy objectives but neither expressly authorizes billboards in business areas nor explicitly limits the authority of municipalities to prohibit billboards in such areas. Although the findings of section 5226 could be read literally to authorize maintenance of billboards in commercial areas despite any contrary local prohibition[18] such an interpretation apparently conflicts with section 5229, which provides that "The provisions of this chapter shall not be construed to permit a person to place or maintain in existence . . . any outdoor advertising prohibited by . . . any ordinance of any city. . . ." Section 5230 further confirms the authority of a city under the police power; it states that "The governing body of any city, county, or city and county may enact ordinances, including, but not limited to, land use or zoning ordinances, imposing

---

[18]If section 5226 were construed to authorize billboards in commercial areas of cities, including locations not adjacent to state or interstate highways, it might be invalid as a regulation of a municipal affair. (See *Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137].)

restrictions on advertising displays adjacent to any street, road, or highway equal to or greater than those imposed by this chapter."[19]

Viewed in context, section 5226 appears to be a statement of policy, adopted to explain why the Legislature enacted a statute providing for the eventual elimination of outdoor advertising displays adjacent to state and interstate highways in noncommercial areas, but not for the prohibition of such displays within business areas. The section does not constitute a substantive limitation on the police power of the municipality, and thus should not be construed to preempt municipal authority.

Section 5412, the other provision on which plaintiffs rest their preemption argument, does serve to preempt the San Diego ordinance to a limited extent. Section 5412 provides that: "If federal law requires the states to pay just compensation with regard to the removal of any advertising display, the owner or owners of such advertising display and the owner or owners of the land upon which such display is located, shall be paid just compensation. The sole intent of the Legislature in enacting this section is to comply with federal law, and it is otherwise not the intent of the Legislature to in any manner relinquish any of its powers relating to the removal of advertising displays under the police power."[20] As the language of the section demonstrates, it requires payment of compensation only when such payment is necessary to comply with *federal law.* (See 55 Ops.Cal.Atty.Gen. 1 (1972). Analysis of the alleged preemptive effect of section 5412, consequently, requires a review of the provisions of the relevant federal statute, the Highway Beautification Act of 1965 (23 U.S.C. § 131), as amended in November of 1978 (see 92 Stat. 2700-2701).

Subsection (b) of the act provides for a 10 percent cut in federal-aid highway funds to any state which fails to provide effective control of outdoor advertising signs, displays, and devices which fall in either of two categories: (1) signs "within six hundred and sixty feet of the nearest edge of the right-of-way and visible from the main traveled way [of]

---

[19]Further lack of clarity arises from the language of section 5227, which states that "It is the intention of the Legislature to occupy the whole field of regulation by the provisions of this chapter except that nothing in this chapter prohibits...the passage by any county of reasonable land use or zoning regulations affecting the placing of advertising displays ...." If this language is intended to grant only counties, and not cities, authority to regulate advertising by zoning, it is inconsistent with section 5230.

[20]The quoted language is the text of section 5412 as enacted in 1975. The language of prior section 5412 (enacted in 1970), and of prior section 5288.3a (enacted in 1967 and repealed by the enactment of § 5412) does not differ from the present section in any respect material to the instant case.

the Interstate System and the primary system [of federal highways],"
and (2) "those additional outdoor advertising signs, displays, and de-
vices which are more than six hundred and sixty feet off the nearest
edge of the right-of-way, located outside of urban areas, visible from
the main traveled way of the system, and erected with the purpose of
their message being read from such main traveled way."[21] Since all
signs at issue in this litigation are located within urban areas, we are
concerned only with the first category—signs within 660 feet of federal
primary or interstate highways.

Under subsection (c), "effective control" of outdoor advertising signs
requires that all signs within 660 feet of federal interstate and primary
highways must be removed except for official and directional signs,
signs advertising property for sale or lease, on-site advertising, land-
mark signs, and signs advertising free coffee.[22]

---

[21]Subsection (b) reads in full as follows: "(b) Federal-aid highway funds apportioned
on or after January 1, 1968, to any State which the Secretary determines has not made
provision for effective control of the erection and maintenance along the Interstate Sys-
tem and the primary system of outdoor advertising signs, displays, and devices which
are within six hundred and sixty feet of the nearest edge of the right-of-way and visible
from the main traveled way of the system, and Federal-aid highway funds apportioned
on or after January 1, 1975, or after the expiration of the next regular session of the
State legislature, whichever is later, to any State which the Secretary determines has
not made provision for effective control of the erection and maintenance along the In-
terstate System and the primary system of those additional outdoor advertising signs,
displays, and devices which are more than six hundred and sixty feet off the nearest
edge of the right-of-way, located outside of urban areas, visible from the main traveled
way of the system, and erected with the purpose of their message being read from such
main traveled way, shall be reduced by amounts equal to 10 per centum of the amounts
which would otherwise be apportioned to such State under section 104 of this title, un-
til such time as such State shall provide for such effective control. Any amount which
is withheld from apportionment to any State hereunder shall be reapportioned to the
other States. Whenever he determines it to be in the public interest, the Secretary may
suspend, for such periods as he deems necessary, the application of this subsection to a
State."

[22]Subsection (c) reads as follows: "(c) Effective control means that such signs, dis-
plays, or devices after January 1, 1968, if located within six hundred and sixty feet of
the right-of-way and, on or after July 1, 1975, or after the expiration of the next regu-
lar session of the State legislature, whichever is later, if located beyond six hundred and
sixty feet of the right-of-way, located outside of urban areas, visible from the main
traveled way of the system, and erected with the purpose of their message being read
from such main traveled way, shall, pursuant to this section, be limited to (1) direc-
tional and official signs and notices, which signs and notices shall include, but not be
limited to, signs and notices pertaining to natural wonders, scenic and historical attrac-
tions, which are required or authorized by law, which shall conform to national
standards hereby authorized to be promulgated by the Secretary hereunder, which
standards shall contain provisions concerning lighting, size, number, and spacing of
signs, and such other requirements as may be appropriate to implement this section, (2)

Subsection (d), however, provides that a state may agree with the Secretary of Transportation to permit signs whose size, lighting, and spacing are consistent with customary usage in areas zoned commercial or industrial; although subsection (d) is not explicit on the point, its apparent purpose is to permit signs in commercial and industrial areas which absent agreement would be prohibited by subsection (c).[23]

Pursuant to subsection (d), the State of California entered into an agreement in 1968 with the Secretary of Transportation to permit billboards, subject to restrictions on size, spacing, and similar matters, in commercial and industrial zones of all California cities. The agreement, however, contains a caveat: "Nothing contained herein shall be construed to abrogate or prohibit the State or any subdivision of the State from exercising a greater degree of control of outdoor advertising signs, displays and devices than that required by the Act or from adopting standards which are more restrictive in controlling outdoor advertising signs, displays and devices than the provisions of this Agreement." Hence the agreement itself does not prevent San Diego from prohibiting commercial off-site billboards; in effect, the state has elected to protect such billboards under a subsection (d) agreement only when communi-

---

signs, displays, and devices advertising the sale or lease of property upon which they are located, (3) signs, displays, and devices, including those which may be changed at reasonable intervals by electronic process or by remote control, advertising activities conducted on the property on which they are located, (4) signs lawfully in existence on October 22, 1965, determined by the State, subject to the approval of the Secretary, to be landmark signs, including signs on farm structures or natural surfaces, of historic or artistic significance the preservation of which would be consistent with the purposes of this section, and (5) signs, displays, and devices advertising the distribution of nonprofit organizations of free coffee to individuals traveling on the Interstate System or the primary system. For the purposes of this subsection, the term 'free coffee' shall include coffee for which a donation may be made, but is not required."

[23]Subsection (d) reads as follows: "(d) In order to promote the reasonable, orderly and effective display of outdoor advertising while remaining consistent with the purposes of this section, signs, displays, and devices whose size, lighting and spacing, consistent with customary use is to be determined by agreement between the several States and the Secretary, may be erected and maintained within six hundred and sixty feet of the nearest edge of the right-of-way within areas adjacent to the Interstate and primary systems which are zoned industrial or commercial under authority of State law, or in unzoned commercial or industrial areas as may be determined by agreement between the several States and the Secretary. The States shall have full authority under their own zoning laws to zone areas for commercial or industrial purposes, and the actions of the States in this regard will be accepted for the purposes of this Act. Whenever a bona fide State, county, or local zoning authority has made a determination of customary use, such determination will be accepted in lieu of controls by agreement in the zoned commercial and industrial areas within the geographical jurisdiction of such authority. Nothing in this subsection shall apply to signs, displays, and devices referred to in clauses (2) and (3) of subsection (c) of this section."

ties within the state do not prohibit those billboards under the local police power. In 1972, by enacting the ordinance at issue in this litigation, San Diego exercised its power under this caveat and prohibited off-site commercial billboards in areas of the city zoned for commerce or industry.

Finally, we come to subsection (g), the language of which is crucial to the determination of this appeal. That subsection, as amended in 1978, provides that "Just compensation shall be paid upon the removal of any outdoor advertising sign, display, or device lawfully erected under State law and not permitted under subsection (c) of this section, whether or not removed pursuant to or because of this section."[24]

Some of the billboards banned by the San Diego ordinance stand within 660 feet of federal interstate or primary highways. Since these are ordinary advertising billboards, not official signs, landmark signs, or other signs exempt from removal under the act, subsection (c) of the act required their removal. The 1968 agreement between the state and the Secretary of Transportation, however, permitted those billboards to remain standing unless a subdivision of the state adopted more restrictive standards. As we have stated, in 1972, San Diego enacted more restrictive standards by prohibiting off-site commercial billboards, thereby depriving those billboards of the protection of the 1968 agreement. The question therefore arises whether just compensation must be paid upon the removal of billboards previously saved from removal by an agreement between the state and the Secretary of Transportation, but which no longer fall within the protective scope of that agreement.

In our opinion compensation is required. Subsection (g) of the Highway Beautification Act, as amended in 1978, requires compensation upon removal of any billboard "not permitted under subsection (c)." The only billboards permitted under subsection (c) are official signs, on-site advertising, and like exempt signs; the billboards in question do not fall within any of the exemptions and are therefore billboards "not permitted under subsection (c)." Under the literal language of the act, the fact that these billboards were previously protected by an agreement

---

[24]The balance of subsection (g) specifies that "The Federal Share of such compensation shall be 75 per centum. Such compensation shall be paid for the following:

"(A) The taking from the owner of such sign, display, or device of all right, title, leasehold, and interest in such sign, display, or device; and

"(B) The taking from the owner of the real property on which the sign, display, or device is located, of the right to erect and maintain such signs, displays, and devices thereon."

between the state and the Secretary of Transportation, an agreement authorized by subsection (d) of the act, has no bearing upon the fact that they are billboards "not permitted under subsection (c)." The literal language of the federal act therefore compels compensation.

This conclusion finds support in the legislative history of the 1978 amendment which added the phrase "not permitted under subsection (c)" to subsection (g) of the act. The Report of the House Committee on Public Works and Transportation indicated that whenever a state or local government did not exercise its option to enter into an agreement with the Secretary of Transportation to protect signs in commercial and industrial areas, then no distinction could be drawn between signs which could be protected by agreement under subsection (d) and those which could not; "all of the signs are nonconforming with the 'effective control' requirements of subsection (c), and the committee is of the opinion that subsection (g) requires payment of just compensation for their removal. . . . [J]ust compensation must be paid upon the removal of any lawfully erected sign which is not permitted under subsection (c)." (Rep., No. 95-1485, p. 16.)

We have carefully considered the decision of the Washington Supreme Court in *Ackerley Communications, Inc.* v. *City of Seattle, supra*, 602 P.2d 1177. Denying compensation for removal of signs within commercial and industrial zones, *Ackerley* stated that "[s]ince signs within commercial and industrial zones which are not governed by an agreement between the State and the Department of Transportation are not regulated by, and are wholly outside the scope of, the federal statute, the only reasonable interpretation of the statutory language is that it does not require compensation for such signs." (602 P.2d at p. 1184.) We must respectfully disagree with the analysis of *Ackerley*. In our opinion, the federal statute does regulate signs within commercial and industrial zones which are not governed by a federal-state agreement —specifically, the act prohibits such signs unless they fall within the five exempt categories of subsection (c). Consequently, it requires compensation when those signs are removed.[25]

---

[25]The City of San Diego, seconded by the City of Alameda as amicus, advance an argument similar to the *Ackerley* opinion. They contend that subsection (d) of the act and agreements between the state and the Secretary of Transportation pursuant to that subsection impliedly amend and limit the scope of subsection (c). The phrase "not permitted under subsection (c)," they contend, refers only to signs which are both barred by the express language of subsection (c)—that is, signs which are neither official signs, landmarks, or the like—*and* which could not have been protected from removal

The city argues that under the wording of subsection (g) prior to the 1978 amendments, compensation was not required for removal of any sign which constituted a nonconforming use under local zoning[26] (see *Lubbock Poster Co. v. City of Lubbock, supra,* 569 S.W.2d 935, 945), and urges that we should not give the 1978 amendments retrospective effect. The Federal Highway Administration, however, takes the position that the 1978 amendments apply to require compensation for "signs still in existence on November 6, 1978, and those additional signs which were removed prior to November 6, 1978, but were the subject of litigation pending on that date." (Memo. Fed. Highway Administrator, Mar. 6, 1979.) ■ Since the Federal Highway Administration is the agency charged with the enforcement of the Highway Beautification Act, its interpretation of the act merits great weight. (See, e.g., *Northern Ind. Pub. Serv. Co. v. Walton League* (1975) 423 U.S. 12, 15 [46 L.Ed.2d 156, 159, 96 S.Ct. 172]; *Los Angeles v. Public Utilities Com.* (1975) 15 Cal.3d 680, 696 [125 Cal.Rptr. 779, 542 P.2d 1371].) Mindful of that interpretation, and of the risk that this state might lose substantial funds if we were to adopt a construction contrary to that of the federal administration, we conclude that the amended act applies to billboards in existence or removed subject to litigation as of November 6, the effective date of the amendments.

■ We believe that the Highway Beautification Act as amended requires the payment of compensation for removal of all billboards existing or subject to litigation on November 6, 1978, located within 660 feet of federal interstate or primary highways within San Diego and visible from the main traveled way of such highways. We reach that conclusion reluctantly, since its effect in this case and in future cases will probably frustrate the original intent of the Highway Beautification

by a subsection (c) agreement. In other words, they maintain that compensation is required only when the act *as a whole* compels the removal of a sign, and since the act permits signs in commercial and industrial areas which conform to a subdivision (c) agreement, compensation is not required when a local ordinance requires the removal of such signs.

We appreciate the policy arguments in favor of limiting the requirement of compensation to cases in which the act as a whole compels removal of the billboard. The cities' proffered construction of the amended act, however, cannot be reconciled with the language of the amended act and the legislative history of the amendments.

[26]Before 1978 subsection (g) required compensation upon removal of signs "lawfully in existence on the date of enactment of this subsection...[or] lawfully erected on or after January 1, 1968." The chief counsel of the Federal Highway Administration interpreted that ambiguous language to signify that when a sign became a nonconforming use it ceased to be lawfully erected, and thus no compensation was required for its removal. Following the 1978 amendment the Federal Highway Administration withdrew that opinion.

Act: to accelerate the removal of billboards and thereby "promote the safety and recreational value of public travel, and to preserve natural beauty." (23 U.S.C. § 131(a).)[27]

The 1978 amendments have, in effect, inverted the purpose of the act, making the secondary goal of ensuring compensation dominant over the primary goal of encouraging billboard removal. (See Steif, *The Billboards are Back* (June 1979) The Progressive, at p. 44.) Nevertheless, the language and administrative construction of the amended act clearly compel compensation, and local removal of billboards without compensation, even though undertaken to promote public safety and preserve natural beauty, would imperil the state's receipt of federal highway funds.

As we noted earlier, section 5412 of California's Outdoor Advertising Act sought to preempt local police power authority and to require payment of compensation when such preemption was necessary to protect California's receipt of federal highway funds. The City of San Diego contends that the regulation and removal of billboards is a municipal affair and that the Legislature thus may not constitutionally enact legislation which preempts local regulatory power. (See generally *Bishop v. City of San Jose, supra*, 1 Cal.3d 56, 62-63.) We note, however, that receipt of federal highway funds is a matter of statewide concern; consequently local regulation and removal of billboards, to the extent that it endangers such receipt, becomes also a matter of statewide concern. The courts have recognized that municipal action which affects persons outside of the municipality becomes to that extent a matter which the state is empowered to prohibit or regulate (*CEEED* v. *California*

---

[27]In opposing the 1978 amendment to the Highway Beautification Act, the chief counsel for the Federal Highway Administration stated that: "The proposed amendment will have the effect of severely limiting local prerogatives to control outdoor advertising by turning the Highway Beautification Act into a statute which protects signs from local land use decisions and ensuring compensation, irrespective of the reason for removal. This would represent an unprecedented limitation on local zoning authorities. Traditionally, localities have controlled outdoor advertising, along with other types of nonconforming land uses, under the police power, which would allow removal by amortization."

Subsequent to enactment of the amendments, the administration declined to budget funds for the highway beautification program. It explained to Congress that "in light of recently enacted legislation that drastically reduces the scope of the highway beautification program, the budget does not request any funds for this purpose pending completion of a comprehensive Department of Transportation review of the program to determine if it can be successfully continued." (Budget U.S. Gov., Fiscal Year 1980, p. 184.)

*Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 321 [118 Cal.Rptr. 315] and cases there cited); the action of San Diego in that it affects the receipt of federal funds by the state or other California communities falls within that principle.

Accordingly we conclude that San Diego Ordinance No. 10795, to the extent that it permits the removal without compensation of billboards for which compensation is required under title 23, section 131 of the United States Code, is preempted by the California Outdoor Advertising Act, and hence invalid.[28] The application of Ordinance No. 10795 to billboards not protected by federal law—that is, to billboards more than 660 feet from federal interstate or primary highways, or billboards not in existence or removed subject to litigation on November 6, 1978—is not preempted by the Outdoor Advertising Act. The ordinance's proscription upon erection of future billboards is likewise unaffected by the federal requirement for just compensation and thus not preempted by state law.

5. *The San Diego ordinance does not deny plaintiffs the equal protection of the laws.*

█ We reject plaintiffs' contention that the city's failure to pay compensation for the removal of all of their billboards, in light of the requirement for compensation to owners of billboards within the preemptive scope of the Outdoor Advertising Act, denies the equal protection of the laws. Since the distinction involves purely economic regulation it may be sustained if the classification bears a rational relationship to a legitimate state purpose. (*People* ex rel. *Dept. of Transportation* v. *Desert Outdoor Advertising, Inc.* (1977) 68 Cal. App.3d 440, 450 [137 Cal.Rptr. 221].)

---

[28]The City of San Diego argues that "it is to be seriously questioned whether a Federal Act which purportedly is intended to provide 'effective control' and removal of billboards, but which in actuality, due to lack of funding to pay for removal, results in *protection* of billboards, can, without violating the Tenth Amendment of the United States Constitution, prevent use of local police powers under penalty of withholding federal monies." So long as federal funds are available, the Highway Beautification Act's program for a federal-state partnership in removing billboards visible from federal highways clearly presents no substantial issue under the Tenth Amendment. Since the record before us does not indicate that the federal government would not provide whatever funds are needed to pay its 75 percent share for the removal of billboards within 660 feet of federal highways in San Diego, we need not reach the issues that might be posed by federal regulation in the absence of funding.

■ California decisions establish that a city seeking to eliminate nonconforming uses may pursue two constitutionally equivalent alternatives: It can eliminate the use immediately by payment of just compensation, or it can require removal of the use without compensation following a reasonable amortization period. (See *Livingston Rock etc. Co.* v. *County of L.A.* (1954) 43 Cal.2d 121, 127 [272 P.2d 4].)

■ The choice between the alternatives largely involves budgetary considerations. The state has chosen to require compensation when the funds for such purpose are augmented by a 75 percent federal contribution. When such federal funds are not available, the state has not required compensation, and the city has accordingly chosen the more economical alternative of requiring abatement after expiration of an amortization period. We find no denial of equal protection in that decision. (See *Ackerley Communications, Inc.* v. *City of Seattle, supra*, 602 P.2d 1177, 1187.)

6. ■ *The summary judgment cannot be sustained on the ground that the amortization period prescribed by the ordinance as applied to all or any of plaintiffs' signs is unreasonably short.*

The San Diego ordinance requires abatement of all off-site billboards following expiration of an amortization period. That period is computed in the following manner: First, the owner determines the original cost of the sign, including the cost of installation. Second, he deducts 10 percent of that cost for each year the sign has been standing prior to the effective date of the ordinance, arriving at a figure which the ordinance refers to as "the adjusted market value." The ordinance then provides an abatement schedule ranging from one year for signs with an "adjusted market value" of less than $500 to four years for signs with an "adjusted market value" in excess of $20,000.[29]

---

[29]The ordinance was enacted March 14, 1972. It provides the following abatement schedule:

| "Adjusted Market Value | | Abatement Date |
|---|---|---|
| Less than | $ 500.00 | April 1, 1973 |
| $ 500.00 to | 999.99 | July 1, 1973 |
| 1,000.00 to | 1,499.99 | October 1, 1973 |
| 1,500.00 to | 1,999.99 | January 1, 1974 |
| 2,000.00 to | 2,999.99 | April 1, 1974 |
| 3,000.00 to | 3,999.99 | July 1, 1974 |
| 4,000.00 to | 4,999.99 | October 1, 1974 |
| 5,000.00 to | 7,499.99 | January 1, 1975 |

Finally, the ordinance states that notwithstanding the abatement schedule in the ordinance, any signs located within 500 feet of freeways or scenic highways must be removed within 90 days. This provision is based on the fact that such signs were rendered nonconforming uses by prior city zoning ordinances. Since those prior ordinances had been in force for about 3 years before the effective date of Ordinance No. 10795, the signs in question received an actual amortization period of at least 3 years and 90 days.

Thus the amortization period under the ordinance depends upon the conformity of the signs under prior ordinances, the original cost of the signs, and the time elapsed since erection of the signs. As the parties stipulated, the abatement schedule is not computed on the basis of current fair market value, useful life, or income generated by the signs. Relying on that stipulation, plaintiffs contend that the amortization period is unreasonable on its face and hence that the ordinance, to the extent that it requires removal of billboards without compensation or a reasonable amortization period, denies due process of law. The trial court in its memorandum opinion granting the motion for summary judgment found that plaintiffs had not provided sufficient proof that the abatement schedule was unreasonable as applied to their billboards.

■ The California cases have firmly declared that zoning legislation may validly provide for the eventual termination of nonconforming uses without compensation if it provides a reasonable amortization period commensurate with the investment involved. (*National Advertising Co. v. County of Monterey* (1970) 1 Cal.3d 875, 878 [83 Cal.Rptr. 577, 464 P.2d 33]; *Livingston Rock etc. Co.* v. *County of Los Angeles, supra*, 43 Cal.2d 121, 127; *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 454-460 [274 P.2d 34].) The determination of the length of a reasonable period of amortization is not merely a matter of accounting. "It is not required that the nonconforming property concerned have no value at the termination date." (*Art Neon Co.* v. *City and County of Denver*, (10th Cir. 1973) 488 F.2d 118, 121.) The determination instead involves a process of weighing the public gain to be derived from a speedy removal of the nonconforming use against the

| 7,500.00 to | 9,999.99 | April 1, 1975 |
| 10,000.00 to | 12,499.99 | July 1, 1975 |
| 12,500.00 to | 14,999.99 | October 1, 1975 |
| 15,000.00 to | 19,999.99 | January 1, 1976 |
| 20,000.00 | and over | April 1, 1976." |

private loss which removal of the use would entail. (*Hadacheck v. Sebastian* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143]; *Art Neon Co. v. City and County of Denver, supra,* at p. 121; *National Advertising Co. v. County of Monterey, supra,* 1 Cal.3d at p. 886 (dis. opn. of Sullivan, J.); *City of La Mesa v. Tweed & Gambrell Mill* (1956) 146 Cal.App.2d 762, 770 [304 P.2d 803]; *City of Los Angeles v. Gage, supra,* at p. 461; *Modjeska Sign Studios, Inc. v. Berle* (1977) 43 N.Y.2d 468 [402 N.Y.S.2d 359, 373 N.E.2d 255].)[30]

In reviewing the constitutionality of an ordinance providing for amortization of nonconforming billboards we held in *National Advertising Co. v. County of Monterey, supra,* 1 Cal.3d 875, that a one-year amortization period was unreasonable except as to signs which had been fully depreciated for federal income tax purposes. (*Id.,* p. 880.) Other decisions have also stated that a one-year amortization period is generally unreasonable (*National Advertising Co. v. County of Monterey, supra,* 211 Cal.App.2d 375, 381; *City of Santa Barbara v. Modern Neon Sign Co.* (1961) 189 Cal.App.2d 188, 195-196 [11 Cal.Rptr. 57]), but have upheld amortization periods ranging from two years and eight months (*People* ex rel. *Dept. Pub. Wks. v. Adco Advertisers* (1973) 35 Cal.App.3d 507, 513 [110 Cal.Rptr. 849]), to three years (*City of Escondido v. Desert Outdoor Advertising, Inc., supra,* 8 Cal.3d 785; *Naegele Outdoor Adv. Co. v. Village of Minnetonka* (1968) 281 Minn. 492 [162 N.W.2d 206]), to five years (*Art Neon Co. v. City and County of Denver, supra,* 488 F.2d 118, 122; *County of Santa Barbara v. Purcell, Inc., supra,* 251 Cal.App.2d 169; *E.B. Elliott Adv. Co. v. Metropolitan Dade County, supra,* 425 F.2d 1141, 1154). ▉ In light of those decisions we conclude that the amortization period provided in the instant ordinance which ranges from one to four years, depending upon the depreciated value of the sign, is not unreasonable on its face.

Our conclusion that the amortization schedule established in the San Diego ordinance is not facially unreasonable does not demonstrate its validity as applied to each of plaintiffs' signs. ▉ The reasonableness of an amortization period as applied to each billboard depends in

---

[30]In determining the reasonableless of the period of amortization a great variety of factors may be relevant. As listed in *Art Neon Co. v. City and County of Denver, supra,* 488 F.2d 118, 122, the factors include "The nature of the nonconforming use, the character of the structure, the location, what part of the individual's total business is concerned, the time periods, salvage, depreciation for income tax purposes and depreciation for other purposes and the monopoly or advantage, if any, resulting from the fact that similar new structures are prohibited in the same area."

part upon facts peculiar to that structure (see *National Advertising Co. v. County of Monterey, supra*, 1 Cal.3d 875, 879, and cases there cited; *Bohannan v. City of San Diego* (1973) 30 Cal.App.3d 416, 426 [106 Cal.Rptr. 333]). Such facts include the cost of the billboard, its depreciated value, remaining useful life, the length and remaining term of the lease under which it is maintained, and the harm to the public if the structure remains standing beyond the prescribed amortization period.

■ Plaintiffs have the burden of proving the invalidity of the amortization period as applied to each of plaintiffs' structures. (See *Art Neon Co. v. City and County of Denver, supra*, 488 F.2d 118, 121; *National Advertising Co. v. County of Monterey, supra*, 1 Cal.3d 875, 879.) On motion for summary judgment plaintiffs did not attempt to meet this burden as to each structure, but limited their argument to the claim that the abatement schedule was facially unconstitutional because it was not based upon the fair market value or remaining useful life of the billboard. ■ But even though the fair market value and remaining useful life are relevant considerations—they are among the factors which must be evaluated in defining the private loss which is balanced against the public benefit in order to determine the reasonable period of amortization—the failure of the city to base its abatement schedule upon such considerations does not necessarily render that schedule unconstitutional. If the amortization period prescribed by the ordinance is a reasonable one, the fact that the city arrived at that period by a formula which did not include every one of the relevant considerations does not render its ordinance unconstitutional.[31]

As we have stated, on their motion for summary judgment plaintiffs did not attempt to prove the amortization period was unreasonable as applied to specific signs, except for those signs located within 500 feet of freeways and scenic highways for which this ordinance prescribed an amortization period of only 90 days. The city explains, however, that such signs were already nonconforming uses pursuant to an ordinance enacted more than three years earlier and consequently that plaintiffs had already enjoyed an amortization period of three years with respect to such signs. Plaintiffs' evidence fails to demonstrate that an amortization period of three years and ninety days is unreasonably short as

---

[31]Even if the amortization period were found to be unreasonable as to a particular property, that finding would "not invalidate its application to other property or invalidate the ordinance of which it is a part." (*Bohannan v. City of San Diego, supra*, 30 Cal.App.3d 416, 426.)

applied to any of the signs in question. We therefore conclude that the summary judgment in favor of plaintiffs cannot be sustained on the ground that the amortization period of the ordinance is unreasonable as to all or any of plaintiffs' billboards.

7. *The summary judgment cannot be sustained on the ground that the City Council of San Diego failed to comply with the California Environmental Quality Act.*

Plaintiffs contend that Ordinance No. 10795 is invalid because the city council failed before enacting that ordinance to prepare an environmental impact report as required by Public Resources Code section 21151. Plaintiffs' complaints, however, do not allege the city's noncompliance with the requirements of the California Environmental Quality Act, and although over three years elapsed between the filing of those complaints and plaintiffs' motion for summary judgment, plaintiffs offered no amendment to assert such noncompliance. On motion for summary judgment the pleadings define the issues; thus "'[I]n the absence of some request for amendment there is no occasion to inquire about possible issues not raised by the pleadings.'" (*Krupp* v. *Mullen* (1953) 120 Cal.App.2d 53, 57 [260 P.2d 629]; *Gardenswartz* v. *Equitable etc. Soc.* (1937) 23 Cal.App.2d Supp. 745, 752 [68 P.2d 322]; see *Dawson* v. *Rash* (1958) 160 Cal.App.2d 154, 161 [324 P.2d 959].) The issue of the city's alleged noncompliance with the California Environmental Quality Act therefore was not properly before the trial court on the motion for summary judgment, and thus cannot be asserted here as a ground for sustaining that judgment.

8. *Conclusion.*

In summary, we conclude that neither the federal nor the state Constitution bars a municipality from enacting a zoning ordinance which prohibits off-site billboards and requires removal of existing billboards after expiration of a reasonable amortization period. The Outdoor Advertising Act, however, preempts local law to bar the uncompensated removal of existing billboards located within 660 feet of federal interstate or primary highways. Plaintiffs accordingly may avoid uncompensated removal for any billboards falling within the preemptive scope of the Outdoor Advertising Act; plaintiffs also retain the right to show that the amortization period prescribed by the San Diego ordinance is unreasonably short as applied to some or all of their structures.

Because plaintiffs have failed to demonstrate the invalidity of the ordinance on its face, however, the trial court erred in granting their motion for summary judgment.

To hold that a city cannot prohibit off-site commercial billboards for the purpose of protecting and preserving the beauty of the environment is to succumb to a bleak materialism. We conclude with the pungent words of Ogden Nash:

"I think that I shall never see

"A billboard lovely as a tree.

"Indeed, unless the billboards fall,

"I'll never see a tree at all."

The judgment is reversed.

Bird, C. J., Mosk, J., and Manuel, J., concurred.

**RICHARDSON, J.**—I concur in the judgment. I share some of the substantial doubts raised by the dissent of Justice Clark, who discerns serious constitutional difficulties with any governmental scheme calling for the total prohibition of any legitimate business enterprise. Nonetheless, I am persuaded by the majority's analysis that the present ban on off-site billboards meets the minimum constitutional standards established by the United States Supreme Court and that, accordingly, the challenged ordinance must be upheld.

The high court has recently dismissed for want of a substantial federal question an appeal which raised identical issues. In *Suffolk Outdoor Adv. v. Hulse* (1977) 43 N.Y.2d 483 [402 N.Y.S.2d 368, 373 N.E.2d 263], the New York Court of Appeals upheld a local ordinance totally banning all off-site billboards as a rational method of improving community aesthetics. The majority herein correctly observes that the subsequent dismissal of the appeal to the United States Supreme Court must be regarded as a dispositive decision on the merits. (*Hicks* v. *Miranda* (1975) 422 U.S. 332, 343-344 [45 L.Ed.2d 223, 235-236, 95 S.Ct. 2281].) No convincing basis appears for distinguishing *Suffolk*. Accordingly, I agree with the judgment of reversal.

NEWMAN, J., Concurring.—I share Justice Richardson's unease regarding the prohibition that Justice Clark finds illegal. Unlike both of them, however, I believe that we must examine carefully the state as well as the federal Constitution.

Article I, section 2 of the California Constitution declares: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

That second sentence is imperative. By no means does it imply that federal precedents confine freedom of expression in this state. (See art. I, § 24: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution"; *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116] ("A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee. . ."); Note, *Rediscovering the California Declaration of Rights* (1974) 26 Hastings L.J. 481.)

Notwithstanding Ogden Nash's poignant dictum (see next-to-last sentence of the majority opinion), I am not persuaded that this court should defer to city officials' views that one mode of communication in the city should be outlawed because it seems "particularly unsightly and intrusive" (*ante*, p. 868).

Some limits on time, place, and manner are of course permissible. Yet as the majority suggest (see their fn. 16), other varieties of speech indeed may merit more protection than is accorded "commercial speech". Further, I stress the brief reminder in footnote 14 of the majority opinion that an individual advertiser "retains the ability to assert that, owing to the absence of reasonable alternative means of communication, the ordinance cannot constitutionally *be applied* to prevent him from using a billboard to proclaim his message." (Cf. the exhibits in Annex A of the amicus brief filed here on Aug. 27, 1979.)

The ordinance here ought to be redrafted. I hope the drafters will not feel too circumscribed by the majority's footnote 2, which purports (with no citation of legislative history) to proscribe signs that "clearly fall within the intendment of the enactment." Those signs are distinguished from "less obtrusive, noncommercial signs that present no significant aesthetic blight or traffic hazard." Then, in order to articu-

late that distinction, a definition in the Revenue and Taxation Code is endorsed somewhat heroically.

I find in the record no evidence that San Diego lawmakers would have adopted or would now adopt that cryptic, tax-based definition. What about hillside displays and cloth or plastic banners, for example, and signs painted on fences and on the walls of warehouses, barns, other buildings: Are they "rigidly assembled sign[s], display[s], or device[s] permanently affixed . . . or permanently attached" within the endorsed definition? Yet they seem to be "outdoor advertising display signs" within the meaning of the ordinance, and many of them would have some permanence. Also, what happens if a large rather than "a small sign placed on one's front yard" announces a political or religious message or a labor dispute? (Cf. the final sentence of the first paragraph in the majority's fn. 2.)

Those kinds of borderline issues do seem solvable, and thus I concur in the reversal of the judgment.

CLARK, J.—I dissent. The San Diego ordinance unconstitutionally prohibits speech protected by the First Amendment. Because the ordinance must be considered a nullity, other issues are not reached.

The outdoor sign or symbol is a venerable medium for expressing political, social and commercial ideas. From the poster or "broadside" to the billboard, outdoor signs have played a prominent role throughout American history, rallying support for political and social causes. (See, Davidson, Propaganda and The American Revolution (U.N.C. Press 1941); Houck, Outdoor Advertising: History and Regulation (U.Notre Dame Press 1969).) The majority today call for absolute prohibition of this expression in violation of the First Amendment. (*Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]; *Linmark Associates, Inc.* v. *Willingboro* (1977) 431 U.S. 85 [52 L.Ed.2d 155, 97 S.Ct. 1614]; *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817]; *Bigelow* v. *Virginia* (1975) 421 U.S. 809 [44 L.Ed.2d 600, 95 S.Ct. 2222]; *Welton* v. *City of Los Angeles* (1976) 18 Cal.3d 497 [134 Cal.Rptr. 668, 556 P.2d 1119].)

The briefs before us reveal political, cultural and social messages on San Diego billboards that encourage the 55 mph speed limit and safety seatbelt; protest involvement in the United Nations and Vietnam; blast

rising taxes; condemn assassination of the Israeli delegation to the Munich Olympic Games. All such communication is protected by the First Amendment. Commercial communication may be restricted by government only after considering informational value to the public, adequate alternative means for dissemination, and state interest. (*Va. Pharmacy Bd.* v. *Va. Consumer Council, supra,* 425 U.S. 748, 770 [48 L.Ed.2d 346, 363]; *Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447, 455-456 [56 L.Ed.2d 444, 452-453, 98 S.Ct. 1912].) But the issue before us is not scope of permissible regulation of commercial thought. By written stipulation the parties have agreed on the valuable content of materials displayed on outdoor signs the ordinance would prohibit. The stipulation provides that plaintiffs' signs "are located in areas zoned for commercial and industrial purposes"; that outdoor advertising "produces numerous direct and indirect benefits to the public"; and that "*[v]aluable commercial, political and social information is communicated to the public through the use of outdoor advertising.* Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive." (Joint stipulation of facts Nos. 20, 28; *ante,* p. 857; italics added.) As applied in this case, the ordinance clearly prohibits expression of political, social and commercial thought. The ordinance must therefore satisfy the most stringent rules flowing from the First Amendment.

In spite of the stipulation, and without scrutiny of the effect on protected speech, the majority grandly uphold the San Diego ordinance. The majority's withdrawal from this court's recent and unanimous decision in *Welton* v. *City of Los Angeles, supra,* 18 Cal.3d 497, by effectively ignoring it, is particularly significant and distressing.

Under a municipal ordinance not unlike that before us today, the City of Los Angeles prosecuted Mrs. Welton for sidewalk sale of maps revealing the homes of movie stars. When challenged as an invasion of Mrs. Welton's First Amendment rights, the city contended her commercial activity constituted unprotected speech. In holding the ordinance could not be constitutionally applied to Mrs. Welton, we stated: "The fact that some may view the map as lacking opinion, newsworthiness or information of social worth, is constitutionally irrelevant. . . . Mrs. Welton and her maps are entitled to the same First Amendment protection as the political candidate and his political pamphlet." (*Id.,* at p. 504.)

Using both stale and distinguishable cases, the majority attempt to justify the ordinances' blanket prohibition by claiming (1) outdoor signs are not entitled to the same protection as other speech, (2) governmental interests here outweigh any First Amendment interest involved, and (3) "probable" alternative means exist for plaintiffs to communicate public messages.

Cases cited by the majority *predating* recognition of First Amendment protection of commercial speech, upholding zoning ordinances prohibiting off-site billboards, are of no precedential value. Those cases assumed commercial communication lacks First Amendment protection and failed to recognize signs might be used for noncommercial messages. (See, *Markham Advertising Co.* v. *State* (1968) 73 Wn.2d 405, 429 [439 P.2d 248]; *Murphy, Inc.* v. *Westport* (1944) 131 Conn. 292, 302 [40 A.2d 177]; *Matter of Cromwell* v. *Ferrier* (1967) 19 N.Y.2d 263, 270 [279 N.Y.S.2d 22, 225 N.E.2d 749, 21 A.L.R.3d 1212]; *Howard* v. *State Department of Hwys. of Colorado* (10th Cir. 1973) 478 F.2d 581, 584; *United Advertising Corp.* v. *Burrough of Raritan* (1952) 11 N.J. 144, 152 [93 A.2d 362].)

Further, cases relied on by the majority decided following recognition of First Amendment protection of commercial speech (see, Va. Pharmacy Bd. v. *Va. Consumer Council, supra*, 425 U.S. 748; *Bigelow* v. *Virginia, supra*, 421 U.S. 809) are clearly distinguishable from the case at bench.

Contrary to majority assertion (*ante*, p. 867), *Suffolk Outdoor Adv.* v. *Hulse* (1977) 43 N.Y.2d 483 [402 N.Y.S.2d 368, 373 N.E.2d 263], does not resolve the issue of whether the San Diego ordinance violates the First Amendment. Examination of *Suffolk* reveals the New York Court of Appeals devoted a scant paragraph to the First Amendment, summarily determining the ordinance in question was not a regulation based on content, and operative alternative means such as accessory or on-premise billboards existed for outdoor advertising. *Suffolk* does not deal with the issue of whether the ordinance curtailed noncommercial thought similar to the communication stipulated to in this case, so does not examine the availability of adequate alternatives. Thus, while of some precedential value on the issue of permissible regulation of commercial ideas, *Suffolk* does not address the critical issue faced by this

court: whether noncommercial as well as commercial speech can be constitutionally restricted in the manner provided in the ordinance.[1]

Other cases relied on by the majority, while upholding banning of billboards, exempt noncommercial messages from the ban. (*John Donnelly & Sons* v. *Mallar* (S.D.Me. 1978) 453 F.Supp. 1272, 1280; *John Donnelly & Sons, Inc.* v. *Outdoor Advertising Bd.* (1975) 369 Mass. 206 [339 N.E.2d 709, 721]; *Newman Signs, Inc.* v. *Hjelle* (N.D. 1978) 268 N.W.2d 741, 760-762.) Such cases have no precedential value when, as here, the ordinance includes noncommercial thought.

Still other cases relied on by the majority uphold restrictions on billboards because they were banned only in one area but permitted in other areas of the community. (*Donnelly Advertising Corp.* v. *City of Baltimore* (1977) 279 Md. 660 [370 A.2d 1127, 1132] (urban renewal ordinance banning billboards only in the renewal area of the city); *Lubbock Poster Co.* v. *City of Lubbock* (Tex.Civ.App. 1978) 569 S.W.2d 935, 945 (ordinance did not totally prohibit billboards but rather regulated only the location, size, separation and height); *State* v. *Lotze* (1979) 92 Wn.2d 52 [593 P.2d 811, 813] (Washington State Advertising Control Act prohibited billboards along scenic highways but permitted them in commercial and industrial areas).) In contrast, the San Diego ordinance constitutes a total ban on all off-site billboards anywhere in the City of San Diego.

BILLBOARDS ARE ENTITLED TO THE SAME FIRST
AMENDMENT PROTECTION AS OTHER FORMS OF SPEECH

First Amendment protection extends to virtually all media utilized to disseminate ideas. (*Erznoznik* v. *City of Jacksonville* (1974) 422 U.S. 205 [45 L.Ed.2d 125, 95 S.Ct. 2268] (drive-in movies); *Police Depart-*

[1]The majority view the Supreme Court dismissal of appeal in *Suffolk* as indicating that court's approval of the prohibition of off-site billboards. (*Ante*, p. 867; citing *Hicks* v. *Miranda* (1975) 422 U.S. 332, 343-345 [45 L.Ed.2d 223, 235-237, 95 S.Ct. 2281].)

The majority's one-paragraph analysis of *Suffolk* (*ante*, p. 867) based on only a one-line Supreme Court order, itself based on a one-paragraph discussion by the New York Court of Appeals summarily determining there are adequate alternatives while focusing only on advertising alternatives, is not the type of close scrutiny mandated by the First Amendment in limiting speech.

Further, summary dismissals are of only limited precedential value and do not carry the full weight of a Supreme Court ruling after full briefing and argument and certainly do not endorse any matter not considered by the opinion below. (*Washington* v. *Yakima Indian Nation* (1979) 439 U.S. 463, 477, fn. 20 [58 L.Ed.2d 740, 753, 99 S.Ct. 740].)

*ment of Chicago* v. *Mosley* (1972) 408 U.S. 92 [33 L.Ed.2d 212, 92 S.Ct. 2286] (picketing); *Schneider* v. *State* (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146] (leafletting); *Welton* v. *City of Los Angeles, supra,* 18 Cal.3d 497 (roadside sale of maps); *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77 [112 Cal.Rptr. 777, 520 P.2d 1] (posting signs on public utility poles); *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860 [94 Cal.Rptr. 777, 484 P.2d 945] (demonstrations and parades); *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276 [29 Cal.Rptr. 1, 379 P.2d 481] (sound trucks); *California Newspaper Publishers Assn., Inc.* v. *City of Burbank* (1975) 51 Cal.App.3d 50 [123 Cal.Rptr. 880] (newspaper racks).) "The right of free speech necessarily embodies the means used for its dissemination because the right is worthless in the absence of a meaningful method of its expression. To take the position that the right of free speech consists merely of the right to be free from censorship of the content rather than any protection of the means used, would, if carried to its logical conclusion, eliminate the right entirely." (*Wollam* v. *City of Palm Springs, supra,* 59 Cal.2d 276, 284.)

In addressing their first basis in justification of the San Diego ordinance's blanket prohibition—outdoor signs are not entitled to the same protections as other forms of speech—the majority attempt to distinguish outdoor signs from "other forms of communication which courts have held can be subjected only to narrowly drawn regulations serving a compelling governmental interest" (e.g., leafletting, sound trucks, etc.) because an outdoor sign is a "large, immobile and permanent structure" as opposed to "more transitory and less obtrusive media." (*Ante,* p. 870.) Such distinction suffers the same overbreath as the ordinance itself. While the ordinance may seek to prohibit small, unobtrusive *off-site* signs, it permits obtrusive and perhaps even offensive *on-site* billboards. Being equally inconsistent, the majority selectively sustain the prohibition of "offensive" billboards but support the use of sound trucks, picketing, leafletting and demonstrations as constituting "more transitory or less obtrusive media."

Obtrusiveness does not justify total prohibition of protected expression. In *Erznoznik* v. *City of Jacksonville, supra,* 422 U.S. 205, the Supreme Court struck down a city ordinance prohibiting exhibition of a motion picture displaying the bare female body by a drive-in theater whose screen was visible from a public street. Off-site advertising hardly commands the same attention as the "unique type of eye-catching display" of an animated drive-in movie (*id.,* at p. 222 [45 L.Ed.2d at

p. 138]; Burger, C. J., dis.), yet the court noted "the screen of a drive-in theater is not 'so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it.'" (*Id.*, at p. 212 [45 L.Ed.2d at p. 132].)

Obtrusiveness is thus measured by not only quality or degree of offensive intrusion, but also by the ability of the offended to avoid it. Is it not fair to assume that a display of animated nudes on a screen constitutes an intrusion of greater degree than a motionless sign or symbol advertising some product? Yet the Supreme Court did not find the nude display so offensive that its effect could not be kept within permissible limits. Off-site displays also are not so offensive that they cannot be kept within reasonable limits.

While obtrusiveness may be a factor to be weighed in the balance in determining whether a restriction is reasonable as to time, place and manner, the majority fail to even attempt a balance. Rather, they use obtrusiveness as a sole reason, a la Ogden Nash, for the blanket ban on billboards.

In instances when obtrusiveness has been deemed a factor justifying billboard regulation, the courts were persuaded by other considerations, such as the discredited view that the Constitution did not protect commercial speech, or that only those billboards next to interstate and state highways should be banned. (*General Outdoor Adv. Co.* v. *Department of Public Wks.* (1935) 289 Mass. 149 [193 N.E. 799, 803-804, 814]; *Markham Advertising Co.* v. *State* (1968) 73 Wn.2d 405, 428-429 [439 P.2d 248].) In this case, obtrusiveness must be balanced against constitutional protection given noncommercial as well as commercial uses of billboards, and the total ban of the San Diego ordinance. These factors compel the conclusion the ordinance is over-broad, constituting an impermissible infringement on First Amendment protections.

GOVERNMENTAL INTERESTS DO NOT JUSTIFY THE
ORDINANCE'S INFRINGEMENT ON FIRST AMENDMENT RIGHTS

The majority assert as their second justification for blanket prohibition that the balance must be tilted in favor of governmental interests, resulting in imbalance.

While recognizing that aesthetic beauty and traffic safety are legitimate police power objectives, the majority fail to show these interests

outweigh First Amendment rights of plaintiffs, advertisers and the viewing public.[2] The conflict between police powers on the one hand and First Amendment rights on the other must seek compromise, allowing government to reasonably regulate the time, place and manner in which First Amendment rights may be exercised. (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104 [33 L.Ed.2d 222, 92 S.Ct. 2294]; *Healy* v. *James* (1972) 408 U.S. 169 [33 L.Ed.2d 266, 92 S.Ct. 2338]; *Welton* v. *City of Los Angeles, supra*, 18 Cal.3d 497; *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684 [68 Cal.Rptr. 721, 441 P.2d 281]; *Wollam* v. *City of Palm Springs, supra*, 59 Cal.2d 276.) Thus government may validly regulate the use of newsracks (*Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294 [138 Cal.Rptr. 53, 562 P.2d 1302]), sound trucks (*Kovacs* v. *Cooper* (1949) 336 U.S. 77 [93 L.Ed.513, 69 S.Ct. 448, 10 A.L.R.2d 608]), street sales of goods or merchandise (*Welton* v. *City of Los Angeles, supra*, 18 Cal.3d 497), and the operation of "adult" movie theaters (*Young* v. *American Mini Theatres* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440]). Similarly, off-site advertising signs may be reasonably regulated.

Notwithstanding the state's power to regulate, such power "does not necessarily sanction the outright prohibition." (*Wollam* v. *City of Palm Springs, supra*, 59 Cal.2d 276, 284.) To be constitutionally reasonable, regulation of time, place or manner must be written narrowly and explicitly, in furtherance of a legitimate police power purpose. (*Welton* v. *City of Los Angeles, supra*, 18 Cal.3d 497.) But here the majority push police power objectives so far from center balance as to abolish protected speech. The *absolute prohibition* of off-site signs is justified by neither community appearance nor traffic improvement. Furthermore, the ordinance—written in terms of total prohibition—is not susceptible to interpretation avoiding constitutional infirmity. (See *Welton* v. *City of Los Angeles, supra*, 18 Cal.3d 497.)

Further, in support of the conclusion that the city's interest in regulating commercial use of property justifies the instant ordinance the majority mistakenly rely on *Young* v. *American Mini Theatres, supra*, 427 U.S. 50. While upholding a zoning ordinance restricting the location of "adult" theaters, *Young* was careful to observe the First Amendment protection of such communication from total suppression.

---

[2] It is well-settled that the right to receive "information of potential interest and value" is protected by the First Amendment. (*Bigelow* v. *Virginia, supra*, 421 U.S. 809, 822 [44 L.Ed.2d 600, 612]; see also, *Stanley* v. *Georgia* (1969) 394 U.S. 557, 564 [22 L.Ed.2d 542, 549, 89 S.Ct. 1243].)

While *Young* affirms the proposition that commercial speech acquires a lesser degree of constitutional protection than other more traditionally protected varieties of thought (*id.*, at p. 68 [49 L.Ed.2d at pp. 324-325]; *Ohralik* v. *Ohio State Bar Assn., supra*, 436 U.S. 447, 455-456 [56 L.Ed.2d 444, 452-453]), the statute was upheld in part because it did not completely ban theaters from the city. Instead, theaters were restricted to areas more than 500 feet beyond residential areas and 1,000 feet beyond other adult establishments. In contrast, the San Diego ordinance bans billboards altogether.

### ADEQUATE ALTERNATIVE MEANS OF DISSEMINATION OF SPEECH ARE NOT AVAILABLE

The third purported justification urged by the majority in support of the ordinance—existing "adequate alternative means" for advertisers to communicate their ideas—is likewise without merit. The parties' stipulation establishes that the ordinance will eliminate outdoor advertising, that outdoor advertising benefits the public in numerous ways, and that politicians and others rely on outdoor advertising because other forms of advertising are "insufficient, inappropriate and prohibitively expensive." (See Joint Stipulation of Facts Nos. 20 and 28, *ante*, p. 857.) Thus, in numerous situations, including the delivery of political messages, traditional off-site advertising is the only practical means of communicating.

The majority further rely on *John Donnelly & Sons* v. *Mallar, supra*, 453 F.Supp. 1272, as support for the proposition that alternative means of communicating such as on-premise advertising, official business directional signs, tourist information centers and publications justify the ordinance's prohibition against outdoor advertising. However, *Mallar* is limited to a ban on only *commercial* billboards: ". . . non-commercial messages such as those conveyed by political, civic and charitable signs, are specifically exempted from the broad ban on off-premises advertising." (*Id.*, at p. 1280.) *Mallar*'s holding that existing alternatives justified a ban on commercial speech, while specifically exempting noncommercial messages from that holding, forecloses any argument that such alternatives would justify a ban on noncommercial messages as proposed by the broad San Diego billboard ban.

Recognizing freedom of speech entails not only communication, but effective communication, courts have refused to impose absolute prohibition of a medium when there exists no practical alternative. In our

recent case of *Welton* v. *City of Los Angeles, supra,* 18 Cal.3d 497, we unanimously invalidated on First Amendment grounds an ordinance banning sidewalk and parkway sales of commercial books, magazines, maps, and other constitutionally protected material despite readily apparent alternative methods of distribution. We noted the "city has failed to demonstrate that such a broad prohibition is necessary to the attainment of a legitimate police power purpose. Its interest in abating public nuisance cannot be pursued by means infringing personal liberties when less restrictive alternatives are available." (*Id.* at pp. 507-508.) In *Wollam* v. *City of Palm Springs, supra,* 59 Cal.2d 276, we held unconstitutional an ordinance prohibiting use of stationary sound trucks where other methods including moving sound trucks were available. Similarly, in *Linmark Associates, Inc.* v. *Willingboro, supra,* 431 U.S. 85, the Supreme Court rejected a contention that because ample alternative methods of communication existed, an ordinance prohibiting the posting of real estate "For Sale" and "Sold" signs should be sustained.[3]

There being no basis upon which the absolute prohibition of outdoor advertising can be justified, the judgment should be affirmed.

Appellants' petition for a rehearing was denied May 14, 1980, and the opinion was modified to read as printed above.

---

[3]The majority's statement that the "possibility that the ordinance may impede an occasional advertiser from communicating his message to the public, however, is not sufficient to invalidate the ordinance *on its face*" (*ante,* p. 869, fn. 14), ignores both the joint stipulation of facts by which we are bound and traditional First Amendment overbreadth analysis. The parties' stipulation that many advertisers rely exclusively on outdoor advertising provides more than mere "possibility" that communication will be impeded. Furthermore, while the overbreadth doctrine may not apply with the same force in situations involving commercial speech (see *Bates* v. *State Bar of Arizona, supra,* 433 U.S. 350, 380 [53 L.Ed.2d 810, 833]), the instant ordinance affects social and political expressions as well as commercial speech. It is apparent, for instance, that political expression will be significantly curtailed although political campaign posters are authorized. The restriction to temporary signs, less efficient in terms of cost and effectiveness than the prohibited large and permanent display structures whose costs can be depreciated over long periods, will work to the detriment of "the poorly financed causes of little people" (*Martin* v. *Struthers* (1943) 319 U.S. 141, 146 [87 L.Ed. 1313, 1319, 63 S.Ct. 862]), whose proponents are unable to afford other more costly mass media advertising.